131 Cal.Rptr.2d 122 (2003)
106 Cal.App.4th 533
In re CHRISTOPHER I., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Moises I., Defendant and Appellant, Tamara S., Defendant and Respondent.
No. G031449.
Court of Appeal, Fourth District, Division Three.
February 24, 2003.
As Modified on Denial of Rehearing March 10, 2003.
Review Denied April 23, 2003.
*124 John L. Dodd, Tustin, under appointment by the Court of Appeal, for Defendant and Appellant.
Benjamin P. de Mayo, County Counsel, and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.
Donna P. Chirco for Defendant and Respondent.
Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for the Minor. *123

*125 OPINION
FYBEL, J.
Christopher I., born in September 2001, is a dependent of the juvenile court as a result of suffering severe physical abuse. In an unpublished opinion, Tamara S. v. Superior Court (Aug. 21, 2002, G030646), 2002 WL 1939182, we described the abuse. We concluded there was substantial evidence to support the juvenile court's findings by clear and convincing evidence that on December 17, 2001, Christopher was violently shaken and thrown against his crib railing by his biological father, who had shaken Christopher on prior occasions; and Christopher's biological mother was unable or unwilling to protect Christopher.
In our earlier opinion, we concluded that the juvenile court was permitted to order continuation of life-sustaining medical treatment pending a court hearing. In October 2002, the juvenile court held a four-day evidentiary hearing to determine whether removal of life-sustaining medical treatment was in Christopher's best interests. Six medical doctors who were familiar with Christopher and his condition testified in detail. Three of these doctors were Christopher's treating physicians, two were independent pediatric neurologists, and one was an independent pediatrician who specializes in care for children in hospitals and hospices.
Evidence at the hearing showed that since December 2001, Christopher has been comatose, hospitalized in intensive care, and dependent on a ventilator to breathe. Christopher is neurologically devastated, is in a persistent vegetative condition, and has no cognitive function. Christopher has received heroic medical care in a continuous effort to sustain his life. Future medical treatment will be futile. Even if life-sustaining efforts by machine continue, Christopher will succumb to complications of treatment.
Counsel appointed for Christopher as well as counsel for Christopher's biological mother and father (Tamara S. and Moises I., respectively) participated fully in the hearing. Written reports of the Orange County Social Services Agency (SSA) were presented, and a social worker was cross-examined.
Tamara sought withdrawal of Christopher's life-sustaining medical treatment; Moises opposed this request. Counsel for Christopher, relying on the unanimous views of the testifying doctors, agreed that withdrawal of treatment was in Christopher's best interests. SSA took no position and submitted the issue to the court.
The juvenile court determined that it had the authority to consider withdrawal of Christopher's life-sustaining medical treatment pursuant to the Welfare and Institutions Code. The juvenile court concluded there was clear and convincing evidence that it would be in Christopher's best interests to withdraw life-sustaining medical treatment, except for nutrition, hydration and pain medication. Moises appeals.
We hold (1) the juvenile court has jurisdiction to determine whether life-sustaining medical treatment for a dependent child should be withdrawn; (2) a decision regarding whether withdrawal of life-sustaining medical treatment is in the best interests of a dependent child requires consideration of the factors identified in this opinion; (3) the standard of proof for such determination is clear and convincing evidence; (4) an evidentiary hearing with live testimony must be held; and (5) the juvenile court must state its findings on the record, either orally in open court or in a written order. We conclude that in this case the juvenile court applied the correct legal standards and considered the appropriate *126 factors. Substantial evidence supports its decision. Therefore, we affirm.
Moises does not challenge the sufficiency of the evidence, the clear and convincing standard of proof, or that the issue before the juvenile court was the best interests of the child. Instead, Moises argues the juvenile court did not have the authority to order removal of life-sustaining medical treatment from a dependent child. Moises further contends the juvenile court did not have the authority to make medical decisions concerning a dependent child, for whom counsel had been appointed, absent the appointment of a guardian. Next, Moises contends for the first time on appeal that we should reverse the juvenile court's order because of SSA's alleged inadequacies in giving notice pursuant to the federal Indian Child Welfare Act. Finally, Moises contends the juvenile court erred in failing to conduct an examination of Tamara's competency or to appoint a guardian ad litem for her. For the reasons explained below, and based on the relevant authorities, we reject all of Moises's arguments as being without merit.
We appreciate the significance of our decision to Christopher, now one and a half years old. We reach our conclusions with his fate in our minds and our hearts. In making his ruling in the juvenile court, Judge Behn said, "I would ask you to keep Christopher in your prayers and thoughts, as I have done for these last three or four months." We join in Judge Behn's sentiments, and wish Christopher peace and serenity.

I. FACTS

A. Procedural history
In December 2001, when Christopher was three months old, SSA took him into protective custody. SSA filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b) and (e), alleging that: Moises had thrown Christopher against a crib, causing serious brain damage; Moises had been arrested for child endangerment; Moises had violently shaken Christopher on more than one previous occasion; Tamara witnessed Moises throw Christopher into the crib and inflict physical abuse on Christopher; Tamara was unable or unwilling to protect Christopher from harm; and Christopher was on life support and would be neurologically devastated if he survived. (All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.)
SSA filed an amended petition on April 2, 2002. The amended petition restated the allegations of the original petition, and added the following: neither Moises nor Tamara had provided any reasonable explanation for Christopher's injuries; their stories were inconsistent with each other and with their own earlier statements; and Christopher's injuries were consistent with "`Shaken Impact Syndrome.'"
After a joint jurisdiction and disposition hearing in May 2002, the juvenile court found the allegations of the first amended petition to be true by a preponderance of the evidence, and found that Christopher was properly within its jurisdiction pursuant to section 300, subdivisions (a), (b) and (e). Based on these findings, the juvenile court declared Christopher to be a dependent child of the juvenile court, pursuant to section 360, subdivision (d).
The court also found, based on clear and convincing evidence, that (1) Christopher had been the victim of severe physical abuse by Moises; (2) Tamara knew or reasonably should have known Moises was physically abusing Christopher; (3) it would be detrimental to Christopher to vest custody with either of his parents; and (4) Christopher's best interests would *127 be served by vesting custody with SSA. The juvenile court also denied reunification services to both Moises and Tamara, and set a permanency hearing under section 366.26.
Because Tamara stated during the disposition hearing that she intended to authorize withdrawal of Christopher's life support, the juvenile court also ordered that Christopher's life-sustaining medical treatment could not be withdrawn absent a further evidentiary hearing and court order.
Moises filed a notice of intent to file a writ petition challenging the court's findings and orders in setting the permanency hearing, but he later abandoned that petition.
Tamara filed a writ petition challenging the order denying reunification services and prohibiting the withdrawal of Christopher's life-sustaining medical treatment. In Tamara S. v. Superior Court, supra, G030646, we denied Tamara's writ petition.
On September 12, 2002, Tamara filed a petition with the juvenile court for an order authorizing a "Do Not Resuscitate" (DNR) order for Christopher and/or removal of Christopher's life-sustaining medical treatment.
Moises moved to dismiss the petition on the ground Tamara lacked standing. The juvenile court denied Moises's motion without prejudice, citing Tamara S. v. Superior Court, supra, G030646: "I would just point out to everyone before we hear this that on page 15 of the opinion that affirmed the decision, the last line, `We agree with SSA that the ultimate decision must be made after a hearing. So did Judge Behn. Christopher is a dependent child over whom the juvenile court has jurisdiction. Therefore, the court has the statutory responsibility to serve Christopher's best interest.' [¶] And this court's feeling is it doesn't matter who brings the motion. This court has an obligation to determine whether life sustaining medical treatment is in Christopher's best interest, and unless you can show me that I don't have that authority, this court is going to conduct a hearing. [¶] . . . [¶] . . . I think anyone has standing to bring a motion because the ultimate question here is what's in Christopher's best interest, [f] Christopher  evidence was quite clear that Christopher is on a machine. The doctors testified that they don't know whether Christopher could sustain life without those machines. I don't know what's in Christopher's best interest. We simply had a jurisdictional hearing. And at this point, I believe mother has standing to ask the court to make a determination of what's in Christopher's best interest. And I really think that's the crux of her motion. She's framed it in such a way that she's asking me to give her the authority. But the basis of the motion is what's in Christopher's best interest. And the court believes that the Fourth District has mandated that I hold a hearing to determine what's in Christopher's best interest."
At the hearing, Tamara presented the testimony of three of Christopher's treating physicians (Drs. David Hicks, Ragnar Amlie and Gilbert Umnas), and two independent pediatric neurologists who had examined Christopher and reviewed his medical records (Drs. Ira Lott and Perry Lubens). Tamara also introduced as evidence two current photographs of Christopher, curriculum vitae for Drs. Lott and Lubens, and two interim SSA reports regarding Christopher. Christopher's social worker, who authored the interim SSA reports, was cross-examined by counsel for Moises and counsel for Christopher.
Christopher's counsel presented the testimony of Dr. David Sine, an independent physician who specializes in hospital pediatrics *128 and hospice care. Dr. Sine had examined Christopher and reviewed his medical records. A report prepared by Dr. Sine was also offered as evidence. Christopher's counsel also offered one current photograph of Christopher, and the curriculum vitae for Dr. Sine.
Moises offered no witnesses. He did, however, submit an offer of proof that a licensed foster mother was willing to become Christopher's foster mother, legal guardian, or adoptive parent.
SSSA offered no witnesses or evidence, and took no position on the merits of the petition.

B. Evidence regarding Christopher's condition adduced at the hearing
Christopher is not brain dead. "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." (Health & Saf.Code, § 7180, subd. (a).) The testifying doctors agreed that Christopher has some lower- and mid-brainstem activity, and therefore he is not brain dead.
Christopher's life is sustained by a ventilator that operates 24 hours a day to cause his lungs to fill with and then expel air, and by a gastrointestinal tube (G-tube) that provides nutrition. His numerous medications include medications to reduce pain or discomfort. Christopher's physical existence is "100 percent" dependent on technology. Christopher has no gag reflex, no cough reflex, no sucking reflex, and no swallowing reflex.
The testifying doctors all agreed that Christopher is in a persistent vegetative state, with no cognitive functioning. Christopher has no hope of any meaningful recovery. Christopher has shown no signs of improvement since his admission to a long-term-care facility. There are no treatments, experimental or otherwise, that might help him. Maintenance of Christopher's life-sustaining medical treatment is futile; his condition cannot improve, and his current treatment only keeps his bodily functions operating, without any hope for future cognitive or neurological improvement.
At least once a day, and as often as several times an hour, Christopher suffers an episode of increased tensing or stiffening of his muscles; these episodes are generally in response to some type of outside stimulus, such as light, sound or touch. It is becoming more difficult for the doctors to control these episodes and calm Christopher with medication.
There was some disagreement among the doctors as to whether Christopher feels pain. Dr. Amlie testified Christopher could not feel pain at a cerebral level, and the tensing and tremoring he experiences in response to stimuli are spontaneous brain stem activities over which he has no control or perception. Dr. Umnas testified he is "not certain that [Christopher] experiences pain." Dr. Lott testified Christopher experiences "deep pain" but is not suffering from that pain in a cognitive sense. Dr. Lubens testified that "at some level [Christopher] experiences the discomfort of pain," and Christopher's tremors are activated by and in response to pain. While Dr. Lubens stated that, in his opinion, Christopher is experiencing discomfort, it would not be possible to determine what the "depth of the experience" would be, and it would not be the same type of discomfort experienced by someone with cognitive functioning. Dr. Sine testified Christopher's response to uncomfortable stimuli by tensing was an indication that he experiences chronic pain, while acknowledging the concept of pain is *129 still not well understood in the medical community.
Christopher's physical development has also been negatively impacted by his brain injury. Christopher's fontanel (or soft spot), which in normal children remains open until approximately 18 months of age to accommodate growth of the brain, closed before Christopher's first birthday. Christopher suffers from microcephaly, a condition in which the top part of his head is smaller than average, also as a result of the lack of normal brain functioning.
The consensus among the testifying doctors was that Christopher will likely die as a result of some type of collateral problem, such as lung damage caused by repeated bouts of pneumonia and bronchitis, which in turn are caused by an inability to effectively clear Christopher's bronchial tubes and "chronic contamination of the airway." The use of life-sustaining medical treatment over an extended period of time has created complications for Christopher, and these complications will increase and worsen as time goes on. Dr. Amlie testified, "He will have complications to some of the treatment that's been given and that is supporting him. And he will eventually succumb to the complications of the treatment."
Long-term use of artificial respiration through a tracheostomy has potential side effects such as secretions plugging the tube, which may lead to pneumonia and bacterial infections. The use of the ventilator may also result in barotrauma, or the increase in pressure on the chest wall resulting in air being forced out of the lungs and into the surrounding tissue.
Long-term use of the G-tube to provide nutrition increases Christopher's risk of liver and kidney damage. Nutrition passing through the G-tube can cause aspiration pneumonia.
Christopher's lack of any mobility has resulted in hip dysplasia. His bones have become osteopenic, and acts as seemingly simple as changing his diaper have resulted in bone fractures.
Christopher also stores fluid in his skin and has experienced abnormal weight gain. Christopher's edema is indicative of his body's inability to effectively utilize the nutrition being provided by his G-tube. He also suffers from pulmonary edema, and increasingly needs his lungs suctioned.

C. Medical conclusions
Christopher's treating doctors and two of the three independent doctors agreed that continued life-sustaining medical treatment will not benefit Christopher. The third independent doctor (Dr. Lott) had no opinion regarding whether maintenance of life-sustaining medical treatment will benefit Christopher. All the testifying doctors supported removal of life-sustaining medical treatment or at least a DNR order.
Dr. Hicks testified: "I think it's important for us to decide what is in Christopher's best interest. Not in anybody else's best interest, but Christopher's best interest. And right now I do not believe in his condition, that remaining on a ventilator, remaining in a level of possible] discomfort for his whole life would be in his best interest."
Dr. Umnas testified: "I don't see any improvements in [Christopher's] status. He is just being maintained with the mechanical ventilator. He has no quality of life. He can't do any activities of daily living. His eyes are fixed and very sluggish pupils. He cannot track. He cannot speak. He cannot eat or drink on his own or maintain his own bowel functions on his own. And I think he is just being maintained by the ventilator."
*130 Dr. Lott testified that, as a neurologist, he had no opinion regarding whether it was in Christopher's best interests to maintain life-sustaining medical treatment, but also testified that the treatment "benefit[s]" Christopher only in the sense that it prevents him from dying. Dr. Lott also testified that Christopher has no hope for improvement and that maintenance of life support will not change that fact. "I don't think the quality of his life is going to change from what it is now. There is no evidence of conscious awareness, no reaction of any adaptive behavior to external stimuli. There is no evidence of a functioning mind. I don't think anything is going to change if those supports are continued."
Dr. Lubens echoed Dr. Lott's testimony. "I think Christopher is in a hopeless situation. I think that he can't improve. I think that the medical treatment that he has is futile. The futility of the treatment, it's only keeping him alive. And the only thing that happens to him when he is alive, I think, the only thing he does experience is pain, and some pain and some discomfort at some very limited level, [in] some very generalized way. [¶] I don't think he experiences anything else but pain, or nothing. And I think that there is no point to the treatment. There is no hope to make him better. There is no hope for any improvement in the situation which is futile."
Dr. Lubens further testified that continuing Christopher's life-sustaining medical treatment would be pointless. "From a medical standpoint, it's as a doctor, there should be a point to treatment. Treatment should have some goal. Treatment should be to make the person getting the treatment better. And doctors treat diseases and disorders in order to make sick people well. And I think there is  the only thing we are doing with Christopher is in a very heroic way maintaining his life. But again a life where there is virtually no consciousness. [¶] . . . [¶] And it's not a question, I think, in this situation of can it be done, but should it be done. I don't think it should be done."
When questioned about what would be the harm in maintaining Christopher on life-sustaining medical treatment, Dr. Sine replied: "I feel that that goes completely against the Hippocratic Oath for physicians on a physician level in that the number one clause for the Hippocratic Oath is to do no harm. [¶] Clearly we're doing harm with Christopher. We are allowing him to be in pain. We are allowing him to continue to have complications with harm and further medical interventions that cause pain. [¶] On a layman's perspective, I would say anyone who feels that we are not causing him harm just needs to go into the room and look at him and watch him for five minutes. And in five minutes, it becomes quite clear that he is suffering."
Christopher's social worker had no recommendation regarding whether life-sustaining medical treatment should be maintained or withdrawn.

D. The court's ruling
Following the presentation of evidence and argument, the juvenile court judge read his ruling into the record. The court found that it had jurisdiction over Tamara's petition, pursuant to sections 19, 362, subdivision (a), 245.5, and 369. The court rejected Moises's argument that the court lacked jurisdiction over the petition brought by Tamara. The court determined that (1) Tamara's petition was actually a motion under section 388, which had been brought to consider new evidence regarding Christopher's life-sustaining medical treatment; and (2) Tamara had an interest in Christopher and his well-being sufficient to permit a section 388 motion, *131 despite the fact that she had lost custody of him.
The court also rejected Moises's argument that the court had violated due process by using the procedures set out in the Superior Court of Los Angeles County, Local Rules.
The court then made the following findings and rulings:
"The evidence is clear and convincing as to the following findings:
"One, Christopher is in a persistent vegetative condition.
"Two, that he is neurologically devastated.
"Three, the medical testimony that life sustaining medical treatment is of no benefit to Christopher.
"The medical testimony is consistent that life sustaining medical treatment should be discontinued.
"Five, Christopher's chances for recovery are zero. And that there is no miracle drug or experimental treatments that are available to Christopher.
"Six, that Christopher's body is 100 percent dependent on life sustaining medical treatment.
"The issue thus framed, should Christopher be kept on life sustaining medical treatment because it's a benefit or does the burden of that treatment cause suffering and pain that is actually harmful.
"The medical testimony was clear and convincing that Christopher reacts to stimuli that is discomforting and painful. The testimony was clear that his reactions are: one, increased heart rate; two, elevated blood pressure; three, sweating; four, tensing and toning. Pain medication is necessary to calm Christopher during these events.
"The testimony indicates that Christopher may not be aware of pain as we are. However, his reactions would indicate circumstantially that the pain is present. No other reasonable interpretation can be made.
"The evidence is clear and convincing that Christopher's bones are becoming brittle and breaking. That tensing of his body causes joints to dislocate. Even the changing of his diaper causes a reaction. Not a day goes by without this evidence of suffering and pain.
"The medical evidence is that the condition Christopher finds himself in will get worse; that the events of tensing, pain, and suffering will increase.
"The medical evidence is Christopher could live for years in this condition of pain and suffering. The doctors cannot say what degree of pain Christopher experiences, but the circumstantial evidence of his reactions would indicate it is substantial.
"The court agrees with Dr. Sine that all the life sustaining medical treatment is doing is keeping the shell of what Christopher was alive. Life is hope, and Christopher has no hope. He deserved better from his parents than a world of pain and darkness.
"In balancing the evidence, it is clear to this court and this court is convinced that to continue life sustaining medical treatment is to continue pain and suffering for Christopher.
"The court will sign an order authorizing the treating physicians . . . to withhold all treatment other than nutrition, hydration, and pain medication." The minute order provides: "Orders and findings as stated on the record." Moises *132 timely appealed.[1]

II. APPLICABLE STANDARDS
There is no reported case in which a California court has set forth the standards to apply when deciding whether to withhold or withdraw life-sustaining medical treatment from a child who is a dependent of the juvenile court.[2] In reaching our decision in this case, we have analyzed California statutes, case law from California and other states, federal case law, including cases from the United States Supreme Court, treatises and commission reports.

A. What constitutes life-sustaining medical treatment?
Reference to life-sustaining medical treatment includes not only treatments that might be considered extraordinary, such as machines to maintain breathing or circulation, but also the provision of nutrition, hydration and medication. (Cruzan v. Director, Mo. Health Dept. (1990) 497 U.S. 261, 288, 110 S.Ct. 2841, 111 L.Ed.2d 224 (cone. opn. of O'Connor, J.) ["Artificial feeding cannot readily be distinguished from other forms of medical treatment"]; Conservatorship of Drabick (1988) 200 Cal.App.3d 185, 195, fn. 9, 245 Cal.Rptr. 840; Bouvia v. Superior Court, supra, 179 Cal.App.3d 1127, 1141, 1145-1146, 225 Cal. Rptr. 297; Barber v. Superior Court (1983) 147 Cal.App.3d 1006, 1016-1017, 195 Cal.Rptr. 484 ["Medical procedures to provide nutrition and hydration are more similar to other medical procedures than to typical human ways of providing nutrition and hydration. Their benefits and burdens ought to be evaluated in the same manner as any other medical procedure"]; Gray v. Romeo (D.R.I.1988) 697 F.Supp. 580, 586-587 ["Although an emotional symbolism attaches itself to artificial feeding, there is no legal difference between a mechanical device that allows a person to breathe artificially and a mechanical device that artificially allows a person nourishment"]; Coord. Council on Life-Sustaining Medical Treatment Decision Making by the Courts, Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment (1991) pp. 52-53, fn. 73 (Guidelines for State Courts); President's Com. for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment: Report on Ethical, Medical, and Legal Issues in Treatment Decisions (1983) pp. 82-90 (President's Commission).)
This distinction is not at issue in this case because the juvenile court did not authorize withdrawal of nutrition, hydration *133 or medication from Christopher. The analysis that follows, however, would apply equally to another court's decision to withdraw nutrition, hydration or medication from a dependent child.

B. The decision to withhold or withdraw life-sustaining medical treatment is governed by consideration of the dependent child's best interests.
Courts deciding whether to withhold or withdraw life-sustaining medical treatment from persons not legally competent to make their own medical decisions have employed one of two decisionmaking models: the substituted judgment test and the best interests test. The substituted judgment test permits a surrogate to make decisions regarding medical care based on what the patient would have chosen had he or she been competent. (Superintendent of Belchertown State School v. Saikewicz (1977) 373 Mass. 728, 370 N.E.2d 417, 431; see also President's Com., supra, at pp. 132-133; Guidelines for State Courts, supra, at p. 74.) This model assumes some understanding of the patient's wants, desires, feelings, and previous mental and physical states. (In re AC. (D.C.1990) 573 A.2d 1235, 1249-1250; President's Com., supra, at p. 133; Guidelines for State Courts, supra, at p. 74.) The substituted judgment test is therefore an inappropriate tool for making medical decisions for patients like Christopher, who has never been competent to make his own decisions or express his emotions and feelings on the subject. (In re K.I. (D.C.1999) 735 A.2d 448, 455-456.)
The best interests model is the correct one to use in this case. (Barber v. Superior Court, supra, 147 Cal. App.3d 1006, 1021, 195 Cal.Rptr. 484.) Under this model, the decisionmaker is guided by a determination of what medical treatment is in the patient's best interests. (Ibid.; President's Com., supra, at pp. 134-135; Guidelines for State Courts, supra, at pp. 74-75.) In the context of juvenile dependency, weighing the best interests of the dependent child is always the court's paramount concern. (In re Kieshia E. (1993) 6 Cal.4th 68, 84, 23 Cal. Rptr.2d 775, 859 P.2d 1290.) Therefore, the use of the best interests test when considering withdrawal of life-sustaining medical treatment from a dependent child is particularly appropriate in this case.

C. The factors to consider when determining whether to withhold or withdraw life-sustaining medical treatment from a dependent child.
What factors should the juvenile court consider in determining whether it is in a dependent child's best interests to withhold or withdraw life-sustaining medical treatment? In Barber v. Superior Court, supra, 147 Cal.App.3d at page 1021, 195 Cal.Rptr. 484, citing to President's Commission, supra, at page 135, the Second Appellate District identified the following factors to be considered in determining whether to withdraw life-sustaining medical treatment from a previously competent adult who had become comatose: "the relief of suffering, the preservation or restoration of functioning and the quality as well as the extent of life sustained." Barber v. Superior Court emphasized that a court must consider the burdens treatment may cause to the patient in proportion to the benefits it may provide. "A more rational approach involves the determination of whether the proposed treatment is proportionate or disproportionate in terms of the benefits to be gained versus the burdens caused." (Id. at pp. 1018-1019, 195 Cal.Rptr. 484.)
The California Legislature has recognized that medical technology may prolong the process of dying and that "continued *134 health care [that] does not improve the prognosis for recovery may violate patient dignity and cause unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the person." (Prob.Code, § 4650, subd. (b).) Although this statute addresses the right of adult patients to make their own decisions regarding their health care, including the right to refuse life-sustaining medical treatment, it also provides us with further guidance regarding the information a court should consider in deciding whether lifesustaining medical treatment should be withheld or withdrawn from a dependent child.
The Superior Court of Los Angeles County enacted a series of rules listing factors to consider when determining whether continuance or withdrawal of lifesustaining medical treatment is in the best interests of a dependent child, as follows: "(a) Evidence about the minor's present level of physical, sensory, emotional and cognitive functioning; (b) The degree of physical pain resulting from the medical condition, treatment, and termination; (c) The degree of humiliation, dependence and loss of dignity probably resulting from the condition and treatment; (d) The quality of life, life expectancy and prognosis for recovery with and without treatment; (e) The various treatment options, and the risks, side effects and benefits of each of those options; (f) Whether the minor's preference has been or can be ascertained." (Super. Ct. L.A. County, Local Rules, rule 17.4(h).)
A virtually identical list of factors appears in the Guidelines for State Courts, a document intended to provide guidance for trial and appellate courts that preside over cases involving withdrawal of life-sustaining medical treatment. (Guidelines for State Courts, supra, at p. 75.) Courts in many jurisdictions throughout the United States have employed the same, or virtually the same, factors in considering questions of withholding or withdrawing lifesustaining medical treatment from incompetent patients. (See In re Truselo (Del. Fam.Ct, Sept. 19, 2000, No. CN00-09299) 2000 WL 33324536 at p. *12; In re K. I., supra, 735 A.2d 448, 465; In re Rosebush (1992) 195 Mich.App. 675, 491 N.W.2d 633, 640; Matter of Conroy (1985) 98 N.J. 321, 486 A.2d 1209, 1232, 1249; Matter of Beth Israel Medical Center (N.Y.Sup.Ct.1987) 136 Misc.2d 931, 519 N.Y.S.2d 511, 517; In re Guardianship of Grant (1987) 109 Wash.2d 545, 747 P.2d 445, 457.)
We conclude that a court making the decision of whether to withhold or withdraw life-sustaining medical treatment from a dependent child should consider the following factors: (1) the child's present levels of physical, sensory, emotional and cognitive functioning; (2) the quality of life, life expectancy and prognosis for recovery with and without treatment, including the futility of continued treatment; (3) the various treatment options, and the risks, side effects, and benefits of each; (4) the nature and degree of physical pain or suffering resulting from the medical condition; (5) whether the medical treatment being provided is causing or may cause pain, suffering, or serious complications; (6) the pain or suffering to the child if the medical treatment is withdrawn; (7) whether any particular treatment would be proportionate or disproportionate in terms of the benefits to be gained by the child versus the burdens caused to the child; (8) the likelihood that pain or suffering resulting from withholding or withdrawal of treatment could be avoided or minimized; (9) the degree of humiliation, dependence and loss of dignity resulting from the condition and treatment; (10) the opinions of the family, the reasons behind those opinions, and the reasons why the family either *135 has no opinion or cannot agree on a course of treatment; (11) the motivations of the family in advocating a particular course of treatment; and (12) the child's preference, if it can be ascertained, for treatment.
This list is not meant to be exclusive, but is intended to provide a set of factors to be considered, analyzed and weighed. Not all of these factors may be applicable in a given case. The court is not limited to consideration of only these factors, and may take other factors into account when appropriate, especially as medical science and technology develop.

D. The court's decision to withhold or withdraw life-sustaining medical treatment must be supported by clear and convincing evidence.
What is the appropriate burden of proof necessary to sustain the court's findings that withholding or withdrawal of lifesustaining medical treatment is in a dependent child's best interests? The Welfare and Institutions Code requires either proof by a preponderance of the evidence or clear and convincing evidence, depending on the rights being adjudicated. A jurisdictional finding requires proof by a preponderance of the evidence. (§ 355, subd. (a).) Where the stakes are higher, such as where the court is making a dispositional finding to remove the child from the parents' home (§ 361, subd. (c)) or where the court is finding that the child is adoptable and parental rights should be terminated (§ 366.26, subd. (c)(1)), proof must be by clear and convincing evidence. Given the impact of this decision on Christopher, imposition of the highest standard within the Welfare and Institutions Code  the clear and convincing standard of proof  is appropriate. Moises did not raise an objection on appeal to the use of clear and convincing evidence as the standard of proof, and at oral argument Moises's counsel agreed that this is the appropriate standard.
The evidentiary standards employed by other courts considering withholding or withdrawal of life-sustaining treatment from incompetent patients reinforce our belief that the clear and convincing standard is the correct one. (Cruzan v. Director, Mo. Health Dept., supra, 497 U.S. 261, 282, 110 S.Ct. 2841 (opn. of Rehnquist, C.J.) [Missouri's requirement of clear and convincing evidence of adult patient's earlier expressed desire to have life-sustaining treatment withdrawn did not violate due process when patient's parents sought to use substituted judgment test to withdraw feeding tube after an accident caused her to be in a persistent vegetative state]; In re K. I., supra, 735 A.2d at pp. 456, 463-464 [clear and convincing standard applied because a DNR order would have severe consequences for life of minor and would deprive mother of right to make medical decisions for minor]; In re Truselo, supra, No. CN00-09299, 2000 WL 33324536 at p. *13; see also Guidelines for State Courts, supra, at pp. 64-66, and cases cited therein.) The Superior Court of Los Angeles County, Local Rules regarding withholding or withdrawal of life-sustaining medical treatment also require that the court's ruling "be based upon clear and convincing evidence of the minor's best interests." (Super. Ct. L.A. County, Local Rules, rule 17.4(g)(4).)

E. A court deciding whether to withhold or withdraw life-sustaining medical treatment from a dependent child must hear live testimony, evaluate and weigh the relevant factors, and make its findings on the record.
The factors relied on by the juvenile court in rendering its decision must be supported by live testimony at an evidentiary hearing. The Superior Court of Los *136 Angeles County, Local Rules, rule 17.4(g)(3) requires that live medical testimony be presented to a court considering withholding or withdrawal of life-sustaining medical treatment from a dependent child. Since all the relevant evidence in this case was presented through live testimony, we need not consider whether proof by declaration would suffice on some issue. A court should not simply count how many of the factors favor withholding or withdrawal of life-sustaining medical treatment and how many do not; the court must engage in an evaluation of all relevant factors, giving each factor the weight it may deserve, given the circumstances of the case. A court must state its findings on the record, either orally in open court (as the juvenile court did in this case) or in a written order.

III. DISCUSSION

A. Substantial evidence supported the juvenile court's determination that withdrawal of life-sustaining medical treatment was in Christopher's best interests.
In his appellate briefs, Moises did not address whether withdrawal of life-sustaining medical treatment is in Christopher's best interests. At oral argument, Moises's counsel agreed there was substantial evidence to support the juvenile court's conclusions. It is nevertheless important that this court review the decision made by the juvenile court regarding the withdrawal of life-sustaining medical treatment for Christopher. It is also important to consider Christopher's dependency status, his current medical condition and treatment, his chances for recovery, and the acts and wishes of his biological parents. These matters give context and meaning to the questions of the juvenile court's jurisdiction over the decision to withdraw Christopher's life-sustaining medical treatment. In addition, "[i]n light of the important questions raised by this case, this court has the discretion to render an opinion where the issues are of continuing public interest and are likely to recur in other cases." (Dority v. Superior Court (1983) 145 Cal.App.3d 273, 276, 193 Cal.Rptr. 288.)
The juvenile court correctly determined that continuation of life-sustaining medical treatment would not be in Christopher's best interests. There was substantial evidence to support the court's findings. (In re Jacob S. (2002) 104 Cal.App.4th 1011, 1017, 128 Cal.Rptr.2d 654.) The juvenile court considered the applicable factors and found by clear and convincing evidence that: Christopher has no cognitive function, and is in a persistent vegetative state; Christopher's current treatment is of no benefit to him; no treatment will change his current condition; Christopher is 100 percent dependent on the ventilator and the G-tube; immobility caused by Christopher's brain damage is leading to other medical problems, which will increase over time; Christopher may live for many years in his current vegetative condition, if lifesustaining treatment continues; and circumstantial evidence indicates Christopher is in "substantial" pain, and is suffering. The juvenile court's oral recitation of its findings on the record did not refer to the opinions of Christopher's family members. Those opinions, however, are clear from the record, given that counsel for both Moises and Tamara set forth their respective clients' positions regarding withdrawal of life-sustaining medical treatment.
The juvenile court weighed and balanced the factors. The testimony from Christopher's treating physicians and the independent physicians who examined him was both compelling and consistent.
Based on clear and convincing evidence, the juvenile court determined that continuation *137 of Christopher's life-sustaining medical treatment would not be in his best interests. We hold this determination was supported by substantial evidence, and the juvenile court did not err in reaching its conclusion.

B. The juvenile court had the authority to consider and rule on withdrawal of Christopher's life-sustaining medical treatment.

1. The juvenile court has the statutory authority to consider matters relating to life-sustaining medical treatment for dependent children within its jurisdiction.
The juvenile court had jurisdiction over Christopher by virtue of section 300. The evidence presented at the jurisdiction hearing far exceeded that necessary to establish by a preponderance of the evidence that Christopher suffered serious physical harm nonaccidentally inflicted by Moises, and suffered serious physical harm as a result of Tamara's failure or inability to protect him. (§ 300, subds.(a) and (b).) The evidence also showed that Christopher was under the age of five and had suffered severe physical abuse by Moises, and that Tamara knew or reasonably should have known Moises was abusing Christopher. (§ 300, subd. (e).)
"When a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362, subd. (a).)
A competent adult has the right to decide what medical care to receive. (Cobbs v. Grant (1972) 8 Cal.3d 229, 240, 104 Cal.Rptr. 505, 502 P.2d 1.) A recognized corollary to this right is the right to refuse medical treatment. (Barber v. Superior Court, supra, 147 Cal. App.3d 1006, 1015, 195 Cal.Rptr. 484.) The right to refuse or withdraw life-sustaining medical treatment is a subpart (indeed, the most significant one) of the general right to refuse medical treatment. (Prob.Code § 4650, subd. (a); Bouvia v. Superior Court, supra, 179 Cal.App.3d 1127, 1137, 225 Cal.Rptr. 297; Bartling v. Superior Court, supra, 163 Cal.App.3d 186, 193-197, 209 Cal.Rptr. 220.) The juvenile court's authority pursuant to section 362, subdivision (a), to make decisions regarding medical treatment for dependent children within its jurisdiction necessarily includes decisions to refuse or withdraw medical treatment, including life-sustaining medical treatment.
Other relevant provisions of the Welfare and Institutions Code illustrate the juvenile court's authority to make all reasonable orders relating to medical treatment for a dependent child. No statute restricts that authority.
For example, section 202 provides that the Welfare and Institutions Code must be liberally construed to permit the juvenile court to obtain care  including medical care  in the dependent child's best interests and consistent with what the parents should have obtained or authorized. Section 202 provides in relevant part: "(a) . . . When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes. [¶] (b) Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment and guidance consistent *138 with their best interest and the best interest of the public."
Under other sections of the Welfare and Institutions Code, the juvenile court is given the authority to make medical decisions for dependent children within its jurisdiction. The juvenile court's authority is triggered in different ways. (See § 369, subds. (a)-(c).) The juvenile court may also direct orders to the dependent child's parent or guardian, regarding the child's medical treatment when necessary and proper for the child's best interests. (§ 245.5.) In the most general sense, section 19 sets forth the purpose of the entire Welfare and Institutions Code  to "establish ] programs and services which are designed to provide protection, support or care of children, . . . to insure that the rights or physical, mental or moral welfare of children are not violated or threatened by their present circumstances or environment."
In this case, Tamara filed a petition seeking a DNR order or an order withdrawing Christopher's life support. The juvenile court determined this petition to be a section 388 motion. Whether or not the petition was treated as a section 388 motion, Tamara was entitled to bring the matter before the juvenile court. Moises argues that only Christopher's counsel, SSA, or a separate guardian ad litem appointed for Christopher could have initiated this proceeding. We agree with the juvenile court that any parent or another interested party had the right to bring the matter before the court. Once the request to withdraw life-sustaining medical treatment was made, the juvenile court had the responsibility to fulfill its statutory obligation to protect the best interests of a child within its jurisdiction. The juvenile court accepted and exercised its responsibility by rendering a decision that lifesustaining medical treatment should be withdrawn from Christopher, following a full evidentiary hearing. In doing so, the juvenile court acted with care, thoroughness and sensitivity.

2. Case law supports the inherent authority of the juvenile court to make decisions regarding life-sustaining medical treatment for dependent children within its jurisdiction.
"California law gives persons a right to determine the scope of their own medical treatment, [and] this right survives incompetence in the sense that incompetent patients retain the right to have appropriate decisions made on their behalf." (Conservatorship of Drabick, supra, 200 Cal.App.3d 185, 205, 245 Cal.Rptr. 840.) The right of an adult or emancipated minor to determine the scope of his or her medical treatment includes the right to refuse medical treatment. (Prob.Code, § 4650, subd. (a).)
Christopher is a minor and not competent to make his own medical decisions. Nevertheless, Christopher has the right to have an appropriate decisionmaker determine whether withdrawal of life-sustaining medical treatment is in his best interests. While it would generally be the right of Christopher's parents to make the determination of what medical treatment (or cessation thereof) is in his best interests, there are two reasons why it was appropriate for the juvenile court in this case to abrogate those rights. First, Moises and Tamara, by their actions, forfeited their rights to determine what is and is not in Christopher's best interests. (In re K. I., supra, 735 A.2d at pp. 453-454 [court had obligation to make decisions regarding issuance of a DNR order, in part, because parent's neglect had caused court to exercise jurisdiction over the child].) There was proof by clear and convincing evidence that Moises's actions in severely shaking Christopher and throwing him against his *139 crib rails directly caused Christopher's current vegetative state. Such proof also showed that Tamara failed to protect Christopher from Moises, despite witnessing episodes of shaking prior to the ultimate one.
Second, in a situation where the dependent child's two parents have a fundamental disagreement over what medical care is appropriate, the juvenile court has the authority to make the decision that is in the child's best interests. (In re K. I., supra, 735 A.2d at p. 454 [District of Columbia took no position on issuance of a DNR for comatose child with severe medical problems; one of the child's parents sought a DNR, while the other was willing to undertake any and all medical care to keep the child breathing].)
The court has an equitable duty to protect the welfare of the children within its jurisdiction. "The state has a `parens patriae interest in preserving and promoting the welfare of the child. . . .'" (In re Sade C. (1996) 13 Cal.4th 952, 989, 55 Cal.Rptr.2d 771, 920 P.2d 716, quoting Santosky v. Kramer (1982) 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599.) The parens patriae power permits a court with jurisdiction over an individual under a disability to order withdrawal of his or her life-sustaining medical treatment. (In re Quinlan (1976) 70 N.J. 10, 355 A.2d 647, 665-666.) As the court explained in In re Quinlan, the first significant case considering the rights of the incompetent with respect to withdrawal of life-sustaining medical treatment, the courts have a nondelegable responsibility to make these decisions as a result of their inherent equitable powers. (Ibid.)
The juvenile court was therefore authorized to exercise its parens patriae power to make medical decisions in Christopher's best interests including, but not limited to, the decision to withdraw life-sustaining medical treatment.

3. The juvenile court was not required to appoint a guardian for Christopher.
We reject Moises's argument that the juvenile court was required to appoint a guardian for Christopher, or to cede to a legal guardian the right to decide whether to withdraw Christopher's life-sustaining medical treatment.
In dependency cases involving child abuse or neglect, California law requires the appointment of a guardian ad litem for a minor. (§ 326.5.)[3] The same statute expressly provides that this role may be filled by either the attorney appointed by the juvenile court to represent the minor's interests, or by a court-appointed special advocate. (§§ 317, 326.5; In re Charles T. (2002) 102 Cal.App.4th 869, 125 Cal.Rptr.2d 868.) If an attorney is appointed to represent the minor's interests, the juvenile court need not appoint a separate guardian ad litem. (In re Charles T., supra 102 Cal.App.4th at p. 879, 125 Cal.Rptr.2d 868.) While the California Rules of Court permit the juvenile court to appoint a guardian ad litem to *140 represent a dependent child when appropriate under the circumstances, they do not require such an appointment. (Cal. Rules of Court, rule 1438(f).)
Dority v. Superior Court, supra, 145 Cal.App.3d 273, 193 Cal.Rptr. 288 also supports our conclusion that the juvenile court had the authority to enter the order from which Moises appeals without appointing a guardian for Christopher. In that case, a 19-day-old infant was admitted to a hospital with a possible seizure disorder. (Id. at p. 275, 193 Cal.Rptr. 288.) The infant's condition deteriorated, and tests performed one week after admission and then one month later indicated brain death. (Ibid.) The infant's doctor recommended removal from the artificial respirator. (Ibid.) The infant's parents had been arrested and charged with felony child neglect or child abuse, and refused to consent to removal from the respirator. (Id. at p. 276 & fn. 2, 193 Cal.Rptr. 288.) An unidentified person or entity petitioned the court to appoint a guardian to consent to termination of the infant's life support. (Ibid.) The court appointed the Director of the Department of Public Social Services as temporary guardian. (Ibid.)
Moises cites Dority v. Superior Court, supra, 145 Cal.App.3d 273, 193 Cal.Rptr. 288, in support of his argument that the juvenile court erred in failing to appoint a guardian for Christopher. We disagree with Moises for two reasons. First, the court specifically pointed out that in the case of a minor who is the victim of child abuse, the issue of withdrawal of life-sustaining medical treatment would be better handled by the dependency court, rather than through a guardianship proceeding. "Welfare and Institutions Code section 300 et seq. would seem to provide a more appropriate vehicle for expeditiously resolving these problems." (Id at p. 278, fn. 3, 193 Cal.Rptr. 288.) Moises argues that Dority v. Superior Court cannot support the dependency court's decision because that case does not cite to a specific section within the Welfare and Institutions Code. The lack of a specific statutory reference is unpersuasive. The minor's parents were unable to provide for the child's care because of the abuse they were alleged to have inflicted on the minor and their subsequent incarceration. The court properly noted that under these circumstances the minor could have been made a dependent of the court, in which case the court would have had the authority to make the decision regarding withdrawal of life-sustaining medical treatment. The use of the guardianship proceeding was an alternative to dependent status, and the court was not called upon to specify the procedures that would have been used if the dependency procedure had been implemented instead.
Second, despite the fact that a guardian was appointed for the minor in Dority v. Superior Court, it was ultimately the court that made the decision to withdraw lifesustaining medical treatment from the minor.
In re K. I., supra, 735 A.2d 448, also supports our conclusion. In that case, the District of Columbia Court of Appeals was faced with a factual scenario similar to the one here. Infant K.I. was comatose and "`neurologically devastated.'" (Id. at p. 450.) K.I. had been born prematurely, and as a result suffered from several serious medical problems. (Id. at pp. 450-452.) At the age of six and a half months, K.I. was removed from her mother's care on grounds that her mother had neglected K.I. by failing to ensure K.I. received necessary oxygen and medications, and by failing to ensure K.I. was properly connected to necessary heart and apnea monitors. (Id. at p. 451.) The family division of the Superior Court of the District of *141 Columbia obtained jurisdiction over K.I. as the result of a neglect petition filed against K. I.'s mother. (Id. at pp. 451, 453-454.)
The guardian ad litem appointed for K.I. requested that the court issue a DNR order. (In re K. I., supra, 735 A.2d at pp. 457-458.) The court held an evidentiary hearing on the guardian ad litem's request. (Id. at p. 458.) The guardian ad litem and one of K. I.'s putative fathers supported issuance of a DNR order, and the government took no position. (Ibid.) Both K. I.'s treating physician and an expert in pediatric care and bioethics testified that K.I. was neurologically devastated, capable of feeling pain and discomfort, unable to respond to other stimuli or react to her environment, could not comprehend the world around her, and was incapable of giving or receiving love. (Id. at pp. 458-459.) Two other physicians testified as experts in pediatrics, and the director of a northern Virginia hospice testified as an expert in bioethics. (Id. at p. 459.) One of K. I.'s putative fathers also testified. (Ibid.) All of these witnesses agreed that a DNR order should issue. (Ibid.) Only K. I.'s mother and the other putative father opposed issuance of a DNR order, despite evidence that K.I. had no hope for recovery and resuscitation attempts would only cause her pain. (Id. at pp. 459-60.) K. I.'s mother testified "`any amount of pain is worth it as long as K.I. breathes.'" (Id. at p. 460.)
The family division of the superior court found, and the court of appeals affirmed, that issuance of a DNR order required a "finding by clear and convincing evidence both that it is in K. I.'s best interests to forego aggressive revival measures, and that [mother's] refusal to consent to the issuance of the DNR order is unreasonably contrary to K. I.'s well-being." (In re K. I, supra, 735 A.2d at p. 464.)
The court also determined it had jurisdiction to enter the DNR order because K.I. was a child subject to the court's jurisdiction as a result of her mother's neglect, and therefore the court's parens patriae duty required the court to "tak[e] responsibility for [K. I.'s] course of treatment." (In re K. I, supra, 735 A.2d at p. 461.) The court of appeals affirmed this jurisdictional finding. (Id. at pp. 453-454.)
Moises argues that because the guardian ad litem appointed for K.I. initiated the hearing to determine whether a DNR order should issue, In re K.I. supports his contention that the juvenile court in this case lacked jurisdiction to enter the order authorizing withdrawal of Christopher's life-sustaining medical treatment. We disagree.
The District of Columbia requires the appointment of a guardian ad litem for a minor in every case alleging neglect. "The Superior Court shall in every case involving a neglected child which results in a judicial proceeding, . . . appoint a guardian ad litem who is an attorney to represent the child in the proceedings. The guardian ad litem shall in general be charged with the representation of the child's best interest." (D.C.Code, § 16-2304(b)(5).) The District of Columbia's statutory scheme is different from California's. The appointment of a guardian ad litem for K.I. therefore does not prove that the lack of a guardian in this case was improper. An attorney had been appointed for Christopher whose "primary responsibility" under California law was to "advocate for the protection, safety, and physical and emotional well-being of the child." (§ 317, subd. (c).) Under California's statutory scheme, the appointed attorney serves the same function as the required guardian ad litem in the District of Columbia. Under section 326.5, appointment of a guardian ad litem in addition to appointment of an *142 attorney under section 317 was not required for Christopher.
Barber v. Superior Court, supra, 147 Cal.App.3d 1006, 195 Cal.Rptr. 484, also supports our conclusion. In that case, the court rejected the state's argument that only a legal guardian appointed by the court could make the decision to withdraw life-sustaining medical treatment from an adult in a persistent vegetative state. "While guardianship proceedings might be used in this context, we are not aware of any authority requiring such procedure." (Id. at p. 1020, 195 Cal.Rptr. 484.) The court was careful to note that a requirement that a legal guardian make the decision to withdraw life-sustaining medical treatment from an incompetent patient would have to come from the Legislature. "In the absence of legislation requiring such legal proceedings, we cannot say that failure to institute such proceedings made petitioners' conduct unlawful. Whether such proceedings are to be required in the future is again a question for the Legislature to decide." (Id. at p. 1021, 195 Cal. Rptr. 484.) Almost 20 years later, the Legislature has not enacted a statute requiring the use of guardianship proceedings in cases involving either minors or adults who are no longer competent to make medical decisions. We find that telling.

C. Indian Child Welfare Act (ICWA)  Title 25 United States Code section 1901 et seq.

1. Facts relevant to ICWA analysis.

(a) The original record on appeal
When the dependency petition was initially filed on December 21, 2001, SSA did not state that Christopher might be a member of, or eligible for membership in, a federally recognized Indian tribe, or that he was of Indian ancestry. In an interview with a social worker, however, Tamara had previously stated "she was part Indian from the Puma Tribe." Moises indicated he had no information as to Christopher's American Indian heritage.
In the permanency hearing report, filed August 26, 2002, SSA indicated that notice had been sent to the Puma Indian tribe and the Bureau of Indian Affairs (the BIA), but that no response had yet been received. A search by SSA of the listings of federally recognized tribes did not locate a tribe by the name of Puma. The BIA confirmed that such a tribe was unknown to that agency.
At that point, SSA had attempted to communicate with the tribe identified by Tamara, and had notified the BIA. Tamara then came up with another possible name of the tribe she claimed to belong to  Pima. SSA then checked with the Gila River Indian Community in Sacaton, Arizona, which maintains the records for the Pima tribe. On September 9, 2002, the Gila River Indian Community wrote to SSA, stating, "Base[d] on my research for a Christopher I[.] with date of birth as . . . and Social Security # . . ., the son of Tamara S[.], which I find no person on the Gila River Indian Community roll book, base[d] on the information you provided." The actual notification from SSA to the Gila River Indian Community was not included in the record on appeal.

(b) Request for judicial notice; augmentation of record
SSA filed a request for judicial notice with this court on February 11, 2003, to add documents to the record showing SSA's additional notices to the BIA and the Pima tribes sent in January 2003, and the responses of the BIA and the tribes. All of the documents attached to the request for judicial notice were filed in the case in the juvenile court. (Cal. Rules of *143 Court, rule 12(a)(1)(A).) Christopher, through his counsel, joined in the request on February 18, 2003. Moises had never raised the issue of ICWA compliance by the time the deadline (absent extraordinary circumstances) for augmenting the record on appeal passed. Therefore, SSA could not have known additional material would be necessary in the appellate record. It appears from the documents attached to the request for judicial notice that SSA moved promptly to remedy any alleged deficiencies in the record.
The request for judicial notice is denied because the requirements of Evidence Code sections 452, subdivision (d), and 459, are not satisfied. However, on our own motion, in the interests of justice, we hereby augment the record on appeal with the materials attached to SSA's request for judicial notice.[4] (Cal. Rules of Court, rule 12; Code Civ. Proc, § 909.) "In all cases where trial by jury is not a matter of right . . ., the reviewing court may make factual determinations contrary to or in addition to those made by the trial court. . . . The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal. . . . This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court. . . ." (Code Civ. Proc, § 909, italics added.)
The extraordinary circumstances of this case justify augmentation of the record at this time in the interests of justice. In In re Antoinette S. (2002) 104 Cal. App.4th 1401, 129 Cal.Rptr.2d 15, as in other cases, we approved augmentation of the record on appeal, but in that case there was no objection to the motion to augment. (Id. at p. 1412, 129 Cal.Rptr.2d 15.) We are not limited to augmenting the record under such circumstances, however. The California Legislature, in Code of Civil Procedure section 909, has granted the express authority exercised here. In our view, the interests of justice require that we augment the record in this case because remand of this matter would be futile and would not be in Christopher's best interests. To decline to augment the record in this case would only serve to prolong Christopher's suffering.

(c) The augmented record
On January 22, 2003, SSA sent notice of the proceedings and a request for confirmation of Christopher's status as an Indian child to the BIA, the Gila River Indian Community Council, and the Salt River Pima-Maricopa Indian Community Council. These documents identified the names and birthdates (if known) of Christopher, Tamara, Tamara's parents, and Tamara's grandfather. The documents further indicated that Tamara's father and grandfather might be affiliated with the Arizona Pima Indian tribe, although it was unknown *144 whether they were enrolled in the tribe.
On January 27, 2003, the Salt River Pima-Maricopa Indian Community confirmed in writing that Christopher, Tamara, and Tamara's parents were not enrolled as members of the community, and that Christopher was "not eligible for enrollment through any relative listed in the inquiry."
On February 3, 2003, the Gila River Indian Community confirmed in writing that Christopher was not listed as an enrolled member of the community. It also confirmed that Tamara, her parents and her grandfather were not listed as enrolled members, meaning that Christopher was not eligible for membership.

2. Summary of the parties' positions.
Moises argues that the juvenile court could not authorize withdrawal of Christopher's life-sustaining medical treatment because, in his view, ICWA has not been complied with. SSA argues, to the contrary, that it provided all notices required under ICWA, and that if there was any error, it was harmless. Christopher's counsel joins in SSA's argument. Tamara makes the same arguments as SSA does, but also argues her petition to discontinue Christopher's life support did not trigger the need for further notice under ICWA, and that even if SSA failed to provide the proper notice, the juvenile court still had the authority to enter orders relating to medical care in Christopher's best interests.

3. Will more notices serve the purposes of ICWA?
Tamara's suggestion that her grandfather was a member of some unknown tribe was sufficient to trigger the notice requirements under ICWA, title 25 United States Code section 1912(a). (Cal. Rules of Court, rule 1439(f); In re Antoinette S., supra, 104 Cal.App.4th 1401,1406,129 Cal. Rptr.2d 15.) SSA mailed notices to the BIA and the identified Indian tribes as described above. We express serious doubts about whether any more notices would serve the purposes of ICWA in this case.
ICWA was enacted in response to "`rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (In re Alexandria Y. (1996) 45 Cal.App.4th 1483, 1488-1489, 53 Cal.Rptr.2d 679.) The policy of ICWA is set forth in section 1902 of title 25 of the United States Code: "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."
No one proposes to separate Christopher from an Indian family and place him with a non-Indian family. Whether the juvenile court ruled that withdrawal of lifesustaining medical treatment from Christopher was or was not in his best interests, the stability and security of any Indian tribe or Indian family would not be served. Christopher will never be able to appreciate his alleged Indian ancestry, nor will he procreate and advance the lineage or culture of any Indian tribe.
*145 Christopher's situation is hopeless. He is in a persistent vegetative state, and his condition is irreversible. He is suffering. He will continue in this condition indefinitely only because machines force air into his lungs and nutrition into his stomach. We cannot believe that the United States Congress intended that if SSA failed to give more notice to an Indian tribe or the BIA under the facts presented in this case, all orders of the juvenile court must be reversed. This conclusion is particularly true in this case, because clear and convincing evidence has shown that the purposes of ICWA have been frustrated by Moises's own violent acts.
In this case, more notices to tribes could not have advanced the purposes of ICWA. Where giving literal meaning to a seemingly unambiguous statute would lead to an absurd result or fail to carry out the manifest purpose of the statute, we may construe its language differently; both the United States Supreme Court and the California Supreme Court have so held. (United States v. American Tmcking Asms. (1940) 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345; Times Mirror Co. v. Superior Court (1991) 53 Cal.3d 1325, 1334, fn. 7, 283 Cal.Rptr. 893, 813 P.2d 240; see also In re Charles T, supra, 102 Cal. App.4th 869, 878, 125 Cal.Rptr.2d 868 ["we must construe the various statutes to avoid absurdity and unreasonable results"].)
An interpretation of the relevant statutes here, as argued by Moises, could do no more than to prolong Christopher's irreversible suffering. This result would be absurd and would not serve the purposes of ICWA. The wisdom of Judge Learned Hand illustrates why in appropriate cases we need to give meaning to the purpose of a statute. "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." (Cabell v. Markham (2d Cir.1945) 148 F.2d 737, 739.)
Nothing in the record on appeal or in the arguments of counsel suggests that Christopher does, in fact, have any Indian heritage. There is no reason consistent with the legislative purpose of ICWA to require more notice.

4. Application of the usual ICWA analysis.

(a) Even if we had not augmented the record on appeal, we would, find no error.
Applying the traditional ICWA analysis to the original record on appeal, we find no error in SSA's notices. SSA complied with the requirements of ICWA. Notice was sent by SSA to the BIA. In its report filed August 26, 2002, SSA stated it had notified the Puma Indian tribe, the tribe of which Tamara claimed to be a member. In its Interim Review Report filed September 12, 2002, SSA stated it could not locate any tribe by the name of Puma. SSA did not explain its earlier statement that it notified the Puma tribe. The BIA confirmed that the Puma tribe was unknown to that agency.
When Tamara later came up with another name of the tribe she claimed to belong to, SSA then checked with the Gila River Indian Community in Sacaton, Arizona, which maintains the records for the Pima Indian tribe. That organization also had no record of Christopher's membership in the Pima tribe.
Substantial compliance with the notice requirements of ICWA is sufficient. (In re Kahlen W. (1991) 233 Cal.App.3d 1414, 1421-1422, 285 Cal.Rptr. 507.) SSA must provide the tribe with notice of the pendency of the proceedings and the opportunity *146 to intervene in them. (In re Suzanna L. (2002) 104 Cal.App.4th 223, 232, 127 Cal.Rptr.2d 860.) When the specific tribe cannot be identified, SSA must provide notice to the BIA. In this case, the Puma tribe identified by Tamara could not be located, and notice was sent to the BIA. In doing so, SSA fulfilled its obligations under ICWA, and there was no error. The parties have cited us to numerous cases dealing with compliance with ICWA under the facts of those cases. But no case cited is really analogous to this case, and therefore we do not discuss those cases.

(b) Having augmented the record on appeal, we find no error in notice under ICWA
After SSA complied with ICWA in September 2002, Moises raised the issue of ICWA compliance on appeal. SSA sent notice to the BIA again and to two Pima tribes. SSA has provided this court with copies of the notices, and the responses from the BIA and the tribes. These materials, with which we have augmented the record on our own motion, confirm that SSA complied with ICWA's notice provisions.
Moises argues in his reply brief on appeal that SSA failed to send notice to yet another tribe identified in the Federal Register  the Pauma tribe. We will not turn the process of ICWA notice into a game, where a party sees how many different but similar-sounding names of Indian tribes he or she can come up with. Lest we forget, the original notice to the BIA suggested the name of the "Puma" tribe. The purpose of notice to the BIA is to determine whether a tribe SSA cannot identify exists. The BIA did not identify the Pauma tribe in response to SSA's inquiry, and SSA was not required to continue its search after the results from the Pima tribes came back negative.
Moises also argues the matter must be remanded to the juvenile court to make a factual finding based on the Pima tribes' responses that Christopher is not an enrolled member and is not eligible for membership. Because "[a] tribe's determination that the child is or is not a member of or eligible for membership in the tribe is conclusive" (Cal. Rules of Court, rule 1439(g)(1)), any further factual finding by the juvenile court is unnecessary.

(c) Any error was harmless.
In response to SSA's January 2003 notices (which are a part of the augmented record), the Sacramento office of the BIA replied that the Salt River Pima-Maricopa Indian Community and the Gila River Indian Community Council were not within its jurisdiction, and should be contacted directly. In a petition for rehearing, Moises argues that remand is necessary because this reponse by the BIA was ambiguous. Notice to the BIA is only required if the identity or location of a tribe cannot be determined. SSA identified and located two Pima tribes and provided notices to them. SSA's January 2003 notice to the BIA was therefore superfluous. Even if there were an ambiguity in that notice or in the BIA's response, it is irrelevant.
Even if SSA did not satisfy the notice requirements under ICWA, it is not jurisdictional error that deprived the juvenile court of the ability to consider the petition for withdrawal of life-sustaining medical treatment. "[V]iolation of the 10-day period of notice required by ICWA is not jurisdictional error. The very fact that notice problems are sometimes deemed harmless in ICWA cases [citation] indicates such error is not jurisdictional." (In re Antoinette S., supra, 104 Cal.App.4th at p. 1410,129 Cal.Rptr.2d 15.)
Any error on the part of SSA in this case would be harmless. There is no reason to believe that Christopher is an Indian child, nor is there any reason to believe more notices over more time will result in any more information. Indeed, in the new material provided by SSA, two specific Pima tribes declined to assert any right to become involved in these proceedings, and *147 determined that Christopher is not an enrolled member of the tribe or eligible for membership. Even if Christopher were an Indian child, his condition would prevent him from ever being a part of an Indian family or tribe, participating in the cultural heritage of an Indian tribe, or appreciating the values of Indian culture.[5] The medical evidence presented at the hearing was compelling and consistent. Moises presented no contrary medical evidence, and there is absolutely no reason to believe anyone else  Indian tribes included  could produce any other medical evidence concerning Christopher.

D. The juvenile court's refusal to appoint a guardian ad litem for Tamara or to order a psychological evaluation of her was not in error.
Moises also contends that the court's failure to grant his request to appoint a guardian ad litem for Tamara or order a psychological evaluation of her constitutes reversible error. We initially question whether Moises may raise this issue on appeal. "The statutes regarding appointment of guardians ad litem were enacted to protect minors and insane and incompetent persons." (Briggs v. Briggs (1958) 160 Cal.App.2d 312, 319, 325 P.2d 219.) Moises does not cite, and we have not located, any case in which a competent party challenges a court's order granting the relief sought by an allegedly incompetent party on the ground that the winning party was incompetent. We see no need to "protect" Tamara from the relief she herself sought in this case. If Moises was really arguing that Christopher needed protection from Tamara, the juvenile court's decision to hold an evidentiary hearing before life-sustaining medical treatment could be withdrawn, a decision we agreed with (Tamara S. v. Superior Court, supra, G030646), provided whatever protection was needed.
Even if Moises has standing to challenge the court's refusal to appoint a guardian ad litem for Tamara, we conclude there was no error in the court's decision that Tamara was able to understand the proceedings and participate with counsel. A guardian ad litem may be appointed for a parent in a dependency proceeding if he or she is determined to be incompetent under either the standards of Probate Code section 1801 or Penal Code section 1367. (In re Sara D. (2001) 87 Cal. App.4th 661, 667, 104 Cal.Rptr.2d 909.) The court's failure or refusal to appoint a guardian ad litem is reviewed for an abuse of discretion. (In re Ronell A. (1996) 44 Cal.App.4th 1352, 1368, 52 Cal.Rptr.2d 474.)
In support of his request that a guardian ad litem be appointed to represent Tamara, Moises argued that Tamara did not cook, could not navigate the public transportation system, and had been referred to the county for social services.
The juvenile court appears to have based its decision not to grant Moises's request to appoint a guardian ad litem for Tamara on the standards of Penal Code section 1367, subdivision (a), which provides in part: "A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."
*148 The juvenile court did not abuse its discretion in determining whether a guardian ad litem for Tamara was required. The juvenile court had significant opportunities to consider Tamara's competence and her ability to understand the dependency court proceedings and to assist her counsel, having considered her testimony at the jurisdiction hearing. The court made a factual finding that Tamara's mental disability was not sufficiently severe that she would be unable to understand the proceedings or assist her counsel. Tamara's counsel supported that conclusion. The juvenile court and Tamara's counsel were in a far better position than we are to analyze Tamara's competence.
In any event, the determination for the juvenile court was whether Tamara could understand the nature of the proceedings against her and cooperate with counsel in protecting her interests. (In re R.S. (1985) 167 Cal.App.3d 946, 979, 213 Cal.Rptr. 690.) The evidentiary hearing regarding withdrawal of Christopher's life-sustaining medical treatment was not a proceeding against Tamara, and her best interests were not at issue. The juvenile court did not abuse its discretion in denying Moises's request on this ground.
Although the juvenile court did not expressly consider Probate Code section 1801, we find no abuse of discretion under its standards either. Probate Code section 1801 provides in relevant part: "(a) A conservator of the person may be appointed for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter . . . . [¶] (b) A conservator of the estate may be appointed for a person who is substantially unable to manage his or her own financial resources or resist fraud or undue influence . . . . [¶] . . . [¶] (e) The standard of proof for the appointment of a conservator pursuant to this section shall be clear and convincing evidence." There was no evidence, much less clear and convincing evidence, that Tamara was unable to provide properly for her personal needs for health, food, clothing or shelter, or that she was unable to manage her own financial resources. Given the nature of the proceedings, Tamara's inability to care for her personal needs or manage her money was not relevant to the juvenile court's decision, and the juvenile court did not abuse its discretion.

DISPOSITION
The order of the juvenile court is affirmed.
WE CONCUR: RYLAARSDAM, Acting P.J., and BEDSWORTH, J.
NOTES
[1] Christopher's counsel asks this court to dismiss Moises's appeal on the ground Moises is only Christopher's alleged father and therefore lacks standing to pursue the appeal. Moises participated fully in the proceedings below through his counsel, without objection from any of the parties. Christopher's counsel waived the issue of Moises's standing to participate in this matter by failing to raise the issue below. (In re Cynthia C. (1997) 58 Cal.App.4th 1479, 1491, 69 Cal.Rptr.2d 1; In re Anthony P. (1995) 39 Cal.App.4th 635, 641, 46 Cal.Rptr.2d 107.) In any event, in a prior order we made clear that any argument or objection based on Moises's paternity status is irrelevant to the issues presented by this appeal.
[2] Withdrawal of life-sustaining medical treatment is not the same as physician-assisted suicide. California courts have correctly observed that the "decision to allow nature to take its course is not equivalent to an election to commit suicide with [medical professionals] aiding and abetting therein." (Bouvia v. Superior Court (1986) 179 Cal.App.3d 1127, 1144-1145, 225 Cal.Rptr. 297; see also Bartling v. Superior Court (1984) 163 Cal.App.3d 186, 209 Cal.Rptr. 220.)
[3] "The Judicial Council shall adopt a rule of court effective July 1, 2001, that complies with the requirement of the federal Child Abuse Prevention and Treatment Act (Public Law 93-247) for the appointment of a guardian ad litem, who may be an attorney or a court-appointed special advocate, for a child in cases in which a petition is filed based upon neglect or abuse of the child or in which a prosecution is initiated under the Penal Code arising from neglect or abuse of the child. The rule of court may include guidelines to the courts for determining when an attorney should be appointed rather than a court appointed special advocate, and caseload standards for guardians ad litem." (§ 326.5.)
[4] The documents with which we are augmenting the record are the following: (a) a letter from the BIA dated September 6, 2002; (b) forms 318 and 319 sent by SSA to the BIA, the Gila River Indian Community and the Salt River Pima-Maricopa Indian Community Council on January 22, 2003, and the form 319 sent by SSA to Tamara and to Moises on January 22, 2003; (c) proofs of service, certified mail receipts and facsimile cover pages from SSA sending the forms 318 and 319 to the BIA, the Gila River Indian Community, the Salt River Pima-Maricopa Indian Community Council, Tamara, and Moises; (d) a letter from the BIA dated January 24, 2003; and (e) letters from the Salt River Pima-Maricopa Indian Community Council dated January 27, 2003, and from the Gila River Indian Community dated February 3, 2003.
[5] Even if we accepted Moises's arguments regarding ICWA  which we do not  the appropriate disposition would be to remand to the juvenile court to ensure that notices arguably required under ICWA were sent. The order withdrawing life-sustaining medical treatment would become effective as soon as the statutory time had passed without sufficient competent evidence provided to the juvenile court that Christopher is an Indian child. (In re Suzanna L., supra, 104 Cal. App.4th at p. 237, 127 Cal.Rptr.2d 860.) We already know from the augmented record that all arguably required notices have been sent and that Christopher is neither a member of any tribe nor eligible for membership. Remand would be senseless under these circumstances.