Filed 12/8/14  In re I.G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.G., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>          Plaintiff,<br><br>v.<br><br>T.G. et al.,<br><br>          Defendants and Respondents;<br><br>I.G.,<br><br>          Appellant. | A141013<br><br>(San Mateo County<br>Super. Ct. No. 82914) |

The juvenile court assumed dependency jurisdiction over I.G. when she was 15 months old, finding her at risk of harm, primarily due to her mother's mental health issues.  In a prior appeal, we found the evidence sufficient to support the court's jurisdiction finding.  At a contested status review hearing, the court terminated jurisdiction, finding that the San Mateo County Human Services Agency (Agency) had failed to establish, by a preponderance of the evidence, that the conditions justifying initial assumption of jurisdiction still existed or were likely to recur without continued supervision.  Minor's counsel now appeals the termination order.[1]  We affirm.

---

[1] The Agency has declined to participate in this appeal.

1

# I.     BACKGROUND

In February 2013, C.S., 15-month-old I.G.'s mother (Mother), left I.G. home alone within reach of hazardous objects.  The Agency alleged I.G. was at a substantial risk of serious physical harm (Welf. & Inst. Code, § 300, subd. (b))[2] due to Mother's mental health issues and the inability of I.G.'s father (T.G.; Father) to adequately protect her.  The following June, the juvenile court overruled a demurrer filed by Mother and Father (Parents) and sustained the petition.  We affirmed those rulings in a prior appeal.

The juvenile court rejected the Agency's recommendation that I.G. be removed from Parents' care, but conditioned I.G.'s return to their home on an agreement that I.G. not be left alone with Mother.  The July 2013 family maintenance case plan required Mother to undergo a psychological evaluation; take part in a mental health assessment and follow the treating therapist's recommendations; regularly meet with her psychiatrist and follow his medication recommendations; work with a family care worker on in-home parenting coaching; comply with public health nursing services; express her anger appropriately; and refrain from violence in I.G.'s presence.  Father was required to take part in a mental health assessment and follow any treatment recommendations; work with the family care worker on parenting skills; take I.G. to all medical appointments and follow her physicians' recommendations; ensure that I.G. was never left alone with Mother; and immediately report any concerns about Mother to the Agency.

*August 2013 Psychological Evaluation*

The Agency referred Mother to a clinical psychologist for the psychological evaluation required by the case plan (August 2013 evaluation).  The August 2013 evaluation was based on the psychologist's review of the juvenile dependency record, an interview with Parents, and psychological testing of Mother.  Parents minimized Mother's mental health problems and the incidents that led to the dependency petition.  Moreover, Mother "was a poor historian due to her extreme guardedness and pronounced effort to represent herself favorably.  She was so intently focused on defending herself

_____

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

that she obfuscated, omitted and denied fundamental information about her history and circumstances." Mother further "made an odd impression because of her forceful style of interaction, obliviousness to her state of disarray and disorganized thinking. . . . Her stream of speech was pressured, loud, rapid, and difficult to interrupt. Her thought process was digressive, tangential, evasive and contradictory. Her themes were frequently grandiose. Her mood was expansive and her affect appeared flat. [Her] insight and judgment appeared limited. . . . [H]er thought process and flat affect suggested the possibility of a psychotic level of functioning."

Mother's responses to an Attention Deficit/Hyperactivity Disorder (ADHD) symptom checklist did not meet the criteria for an ADHD diagnosis because she did not report that symptoms started before the age of 14 and because other disorders better accounted for the symptoms. The Minnesota Multiphasic Personality Inventory-2 test yielded invalid results "because [Mother's] answers became increasingly illegible as she continued with the test questions. . . . Instead of filling in the designated spaces, she began making loops which then became increasingly larger, sweeping circles that spanned two or more answer spaces." Other test results "may have also been skewed by [Mother's] pronounced efforts to represent herself favorably." Nevertheless, the test results disclosed mild depression and "multiple hypomanic symptoms including hyperactivity, pressured speech, decreased need for sleep, excessive spending, distractibility, high risk behavior (unsafe driving)" that reportedly occurred during the same time period. Unstructured tests less vulnerable to manipulation yielded results that were "positive for the presence of a mood disorder, coping deficit, severe impairment in reality testing and difficulties in her interpersonal relationships."

In summary, Mother "test[ed] as a very expressive, emotionally driven person who has difficulty processing the flood of emotion that overwhelm[s] her functional capacities. She is often at risk for losing control of her thinking and behavior because her feelings are so disabling. [¶] . . . [She] is lacking in basic functional capacities to manage even simple tasks of life . . . [and] is easily overwhelmed and disorganized by her own emotions and from external challenges. . . . [However, a] fuller picture of her strengths

3

and weaknesses might have been possible with a greater level of cooperation." Mother was diagnosed with "Bipolar I Disorder, Moderate, Most Recent Episode Mixed, With Psychotic Features,"[3] noting that the disorder is a "treatable condition that can be managed with psychotherapy, psychotropic medications, psychoeducation, and support groups," which would allow Mother to function as a competent parent. "However, [Mother] remains a safety risk to her child and herself so long as she continues to fight this diagnosis and resist appropriate treatment interventions."

*Mother's Section 388 Petition and Psychiatrist's September 2013 Letter*

In November 2013, Mother filed a section 388 petition asking the court to rescind the order that she not care for I.G. alone. She attached a September 6, 2013 letter from her treating psychiatrist: "I have been working with [Mother] throughout this year, generally on a monthly basis. The service provided is medication management only (i.e., prescribing and monitoring medication), and no formal 1:1 talk therapy is provided. Her most recent appointment and evaluation by me occurred on 8/16/13. At that time, and at no time during her treatment, have there been observable signs of danger where [Mother] would prove to be a risk for her own or other's health and/or safety. [¶] Additionally, following my most recent evaluation, I have found a noted improvement in [Mother's] mental status and well-being. Therefore, due to her stability and improvement, it is my professional opinion . . . that allowing [Mother] to be alone (unsupervised) with [I.G.] is reasonable and poses no foreseeable risk to [I.G.'s] well-being and safety." The Agency and minor's counsel opposed the petition, and a hearing was set for November 15.

In a report opposing Mother's section 388 petition, the Agency provided the court with the August 2013 evaluation and argued that Parents' continued resistance to

---

[3] The August 2013 evaluation also noted, "There is considerable overlap between the symptoms of ADHD and manic episodes. Both are . . . characterized by excessive activity, impulsive behavior, poor judgment, restlessness, distractibility, sleep difficulties and denial of problems. ADHD is distinguished from Manic Episodes by its characteristic early onset, chronic rather than episodic course, lack of relatively clear onsets and offsets, and the absence of abnormally expansive, elevated or depressed moods or psychotic features."

4

Mother's bipolar disorder diagnosis was impeding their ability to make progress on resolving the issues that led to the dependency. The Agency further noted that Parents believed that allowing Mother to be with I.G. unsupervised would alleviate their concerns about Father getting I.G. from childcare when he needed to work late. On November 15, 2013, the court set both the section 388 petition and the upcoming status review for a contested hearing on February 10, 2014.

*November 2013 Status Review Report*

Later in November 2013, the Agency filed a status review report. I.G. had been seen by a physician in October, who noted normal growth and development except for some flea bites.[4] At all unannounced Agency visits to Parents' home, Father was present with I.G. The family received in-home parenting support from a family care worker a few times a month, and a public health nurse provided support for I.G.'s medical needs. The public health nurse reported that I.G. was clean, happy, playful and interacting appropriately with Parents during a visit in October. The nurse had been unable to arrange a visit in November. Father had a mental health assessment in November, and received no psychiatric diagnosis or treatment recommendations. Mother had had two sessions with a therapist, but no progress report was available. I.G. and Parents were participating in sessions with I.G.'s therapist, Susan Farabee. Farabee recommended Mother engage in dyad therapy with I.G. before being allowed to care for I.G. alone.

The Agency opined that I.G. would be at risk if the dependency case was dismissed. "[M]other has only recently been assigned to work with a therapist and has not engaged in dyad treatment with the child . . . . Concerns still exist regarding [M]other's mental health. Despite a psychological evaluation, [Parents] feel that the results are inaccurate. The minimization of the seriousness of [Mother's] condition could potentially jeopardize the safety of the child if services were not in place . . . ."

---

[4] On October 23, 2013, the Agency received a referral that I.G. smelled like vomit, suffered from severe diaper rash, had feces on her, and was demonstrating self-stimulating behaviors such as rocking to soothe herself and disassociation. The Agency eventually deemed the referral unfounded.

*December 2013 Therapist's Report*

In an addendum report filed December 9, 2013, the Agency submitted a report by Farabee based on the 11 therapy sessions she had conducted with I.G. and Parents between July and November.[5] Farabee wrote that one goal of her therapy was for I.G. to display five healthy attachment skills by June 2014. I.G. had already displayed two such skills: playing a game with Mother in which they matched each other's bright affect and seeking out Father for comfort when she was sick. Another goal of the therapy was for Parents to sing songs, teach body parts, read books and verbally reciprocate with I.G. Farabee had seen Mother teach I.G. body parts and read her a book, and Mother reported that she also sang songs with I.G. Both parents were working on reading consistently to I.G. In response to a question on the report form about whether there was a substantial risk to I.G., Farabee wrote, "I am concerned with the emotional well being of [I.G.], as it is difficult to get [Mother] engaged in play with her as well as stay engaged with her. An example would be, when [I.G.] hands [Mother] a toy to play with, [Mother] misread[s] the play cue and puts the toy aside."

*January 2014 Psychiatric Evaluation*

Shortly before the contested hearing, Parents produced a January 22, 2014 "psychiatric diagnostic evaluation and report" by Mother's treating psychiatrist (January 2014 evaluation), in which he offered his opinion on Mother's capacity to care for and independently control I.G.[6] The psychiatrist stated he was board certified by the American Board of Psychiatry and Neurology, worked as an assistant clinical professor at the University of California San Francisco Medical Center, and had previously been qualified as a court expert. He based his opinion on 13 "serial psychiatric evaluations" he had conducted with Mother between March 2013 and January 2014; the August 2013

---

[5] In early December 2013, a new therapist (Geeta Devjani) had been assigned to I.G. after Parents raised concerns that Farabee inappropriately disclosed confidential information.

[6] Neither minor's counsel nor the Agency subpoenaed the psychiatrist to appear at the February status review hearing and neither requested a continuance so he could appear.

evaluation; and June 2012 medical records reflecting a bipolar disorder diagnosis for Mother.

Mother self-reported experiencing attention deficit disorder (ADD) symptoms before becoming a teenager. She claimed she was deemed psychotic at I.G.'s birth in part because she had stopped taking her ADD medication (Dexadrine) when she became pregnant. After she was diagnosed as bipolar in June 2012, she took Depakote and Prozac as prescribed but continued to experience distraction and anxiety, and questioned whether these medications were appropriate for her. The psychiatrist's initial diagnostic impression in March 2013 was of a woman with severe ADD, anxiety, and possibly brief psychotic episodes who had mildly disorganized thought processes and stared off at times. He saw no history consistent with manic episodes. He tapered Mother off of Depakote and prescribed her Adderall for ADD, Prozac for depression, and Klonopin for anxiety. He later took her off Klonopin and added Restoril as a sleep aid. Due to "periodic continuing presentations of psychotic symptoms (gross paranoia, likely internal preoccupation)," he started her on Risperdal, an antipsychotic, in June 2013.[7] As of January 2014, she was taking Risperdal, Adderall, Prozac and Restoril.

In July 2013, Mother, Father and I.G. were observed together for a 45-minute session. Mother was generally appropriate with I.G., and no signs of negligent or unsafe behavior by Mother were observed even though Mother was mildly symptomatic. In January 2014, Mother was able to appropriately describe the responsibilities of a mother and the basic needs of a child.

Mother scored high on two tests for ADD. Mother's presentation was described as "[f]air to at times poor eye contact, fleeting and briefly staring off"; "[g]enerally cooperative, but at times minimizing and dismissive of any symptomatology"; "[n]o push

_____

[7] We deny Parents' requests for judicial notice of a Web site and documents that describe the properties of Risperdal. We generally do not consider evidence that was not before the trial court when the order under review was issued, and no unusual circumstances justify doing so in this case. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 400.) We further deny Mother's motion to strike minor's counsel's opposition to the requests for judicial notice as moot.

of speech"; "[t]hought [p]rocesses: [p]ossible blocking and periodic internally preoccupied[,] [g]enerally linear but some mild disorganization[,] overall goal-directed and coherent"; "[n]o gross delusions"; "[d]enies auditory or visual hallucinations but possible responses to internal stimuli (ie, talking to self)"; "[m]ildly guarded, mildly anxious"; fair insight; fair to good judgment; good impulse control; alert and oriented; and able to sleep well and sit still. She denied depression, rapid or pressured speech, manic episodes, manic spending, impulsivity, auditory or visual hallucinations, or paranoia. She reported mild symptoms of inattention and distraction.

Mother was diagnosed with ADHD, predominantly inattentive; unspecified schizophrenia spectrum and other psychotic disorder; and adjustment disorder with mixed disturbance of emotion and conduct. The psychiatrist specifically opined that Mother did not meet the criteria for a bipolar disorder diagnosis, indicated the June 2012 diagnosis was not supported by the medical records, and implicitly rejected the analysis of the August 2013 evaluation. He opined that Mother was adequately attending to her mental health needs and could independently provide adequate and safe care for I.G. "[T]here are aspects to [Mother] which are noteworthy: i.e., her periodic inconsistencies, her guardedness and minimizing during some interviews, her periodic 'eccentric' presentation and some soft symptoms not addressed by the above diagnoses. The severity of these outliers, however, do not reach the level of clinical relevance nor warrant additional diagnoses and/or treatment." For treatment, he recommended continued medication, therapeutic support, and full custody of I.G., as well as release of any limitations on Mother's interactions with I.G.

*February 2014 Agency Report*

In a February 2014 report, the Agency wrote that the family care worker, Marian Ellette, had reported in December 2013 that she had tried to discuss concerns about Mother's medications with her and had asked her to sign a release so Ellette could talk to Mother's psychiatrist. Mother refused, became defensive, and smiled inappropriately during the discussion. In late January 2014, Ellette reported that Parents had canceled their last three appointments and Mother had again refused to sign the release. Ellette

8

opined that Mother continued to have mental health issues even while on medication, and that Father was ignoring those issues. In January and February 2014, Mother declined Agency requests that she sign a release so the social worker could talk to her therapist.

The Agency argued that Mother continued to pose a risk to I.G. "The refusal to provide consent, the indications of brief psychotic episodes, and the seemingly odd behaviors that have been observed suggest continued concerns with [Mother's] stability. The minimization of the mental health issues by [Parents] result in potential safety concerns that placed the child at risk if left unsupervised with [Mother]." The Agency recommended continued family maintenance with the condition that I.G. not be left alone with Mother.

*February 2014 Contested Hearing*

At the February 2014 joint hearing on status review and Mother's section 388 petition, social worker Daniella Tobey testified there were "still some potentially unresolved issues that may place the child at risk if unsupervised [with Mother]." She based this opinion on the August 2013 evaluation, Parents' rejection of the bipolar diagnosis, reports by Farabee and Ellette that Mother was not fully participating in therapy, and Tobey's personal observation that during monthly home visits Mother did not consistently interact with I.G. or participate in discussions with Tobey. Tobey again noted that she was unable to talk to Mother's psychiatrist or individual therapist because Mother had not signed releases.[8] Tobey said she had asked I.G.'s new therapist (Devjani) for a report on the dyad therapy, but had not heard back.

When the court asked what the Agency wanted Mother to do before the dependency was terminated, Tobey testified: "I feel the [Parents] are very fixated on this diagnosis of ADD, a lot of the legal aspects of the case, and not so much of progressing forward and saying, okay, how do we resolve this issue. . . . [¶] . . . [Also, t]he fact that [Mother] will stare off or become paranoid or have—even as [her psychiatrist] said—

---

[8] Tobey acknowledged that she did not know the circumstances of Mother's declining to sign the release of information for her therapist; on one occasion when Tobey wanted Mother to sign a release, Tobey did not have a form with her.

9

moments of psychosis. . . . This is a two-year-old child.  If [Mother] has an episode of psychosis where she is not able to care for the child, that puts the child at substantial risk of harm."  She disagreed with the January 2014 evaluation that Mother had improved in that respect.  Tobey acknowledged, however, that none of the service providers had described a specific situation in which Mother had placed I.G. at risk.

Father testified that he had not seen Mother do anything that put I.G. at risk, and that he had seen significant improvement in Mother since she started treatment with the psychiatrist.  For example, Mother was not spaced out, communicated more, and attended to I.G. by changing her diapers and feeding her, which Mother had not been doing initially.  He had also seen Mother respond to I.G.'s cues that she was hungry or felt sick, and had seen Mother regularly make eye contact with and hug and kiss I.G.  Currently, I.G. was probably closer to Mother than to Father.  He had also seen Mother actively participate in dyad therapy with both Farabee and Devjani.

In argument, the Agency acknowledged the case was a close call.  It acknowledged that the August 2013 evaluation was nearly seven months old and claimed that the conflict in diagnoses was not driving the Agency's recommendation.  "The issue is more about the present circumstances and [Parents'] ability to recognize and acknowledge the issues that brought them before the Court and to cooperate by signing releases and engaging in open communication with the [Agency] . . . ."  Minor's counsel similarly argued that Mother was not fully compliant with her case plan because she did not sign a release to allow the social worker to speak with her therapist.  When the court asked for case law requiring a parent to sign a release for psychiatric records, the Agency said it did not believe there was such a legal requirement.  However, because the Agency had not been able to consult with certain providers, it had to base its recommendation on observations and reports from other providers:  Tobey, Ellette, Farabee and the clinical psychologist had reported that Mother did not seem to be present or engaged.  Even Mother's psychiatrist noted that she still had concerning symptoms, and while he determined these symptoms did not justify a different diagnosis or specific treatment, the Agency was concerned about whether they rendered Mother unable to safely care for I.G.

The court commented, "It is clear that [M]other presents oddly. It is clear that she has mental health issues." However, "[h]aving a mental illness doesn't of itself mean that the parent cannot be with their child." The Agency asked for six more months of services to make sure Mother was actively participating. The court responded, "I'm not sure that is going to help . . . . She is doing everything you asked her to do from what I can see. [¶] And I understand it is a very difficult and close call, but the burden is on the [Agency]." The Agency said it would be reassured by a report from Devjani that Mother was actively engaging in dyad therapy. The court, however, said it was the Agency's burden to produce reports from the service providers and the court was surprised the social worker had not obtained at least an oral report from Devjani.

The juvenile court expressly found Tobey and Father to be credible witnesses and ruled: "[W]hile the Court understands there are concerns, there certainly are; however, . . . the [Agency] has failed to establish . . . by [a] preponderance of the evidence the conditions still exist that would justify initial assumption of jurisdiction or that those conditions were likely to occur without continued supervision. Therefore, the Court is going to terminate dependency at this time." I.G. appealed.

## II.  DISCUSSION

We previously found that the record in this matter supported assumption of dependency jurisdiction. The only issue before us on this appeal is whether the juvenile court's ruling—that the Agency failed to meet its burden of proof to *continue* jurisdiction—is supported by the record. "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571; [citation].) Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' (*Roesch v. De Mota, supra,* at p. 571.)" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, parallel citation omitted.) As in all cases in which we review a finding for evidentiary support, "we look to the entire record for substantial

11

evidence . . . . [which] must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.]" (*In re N.S.* (2002) 97 Cal.App.4th 167, 172.) "[W]e resolve all conflicts and make reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

Section 364 governs a status review hearing when the dependent child is in parental custody. (*In re N.S., supra,* 97 Cal.App.4th at pp. 171–172.) Section 364, subdivision (c) provides in relevant part: "The court *shall* terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (Italics added.)[9]

We agree with minor's counsel's implicit argument that the relevant evidence is not limited to developments that have taken place since the last hearing (here, the jurisdiction and disposition hearing that took place in June 2013), but also includes the facts that initially supported dependency jurisdiction. Based on the entire record of the dependency case, the court must determine whether "the conditions *still* exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c), italics added.) Moreover, the Agency need not prove that the child faced a substantial risk of harm since the last hearing, but may satisfy the section 364 standard by demonstrating that at the time of the status review hearing the child would face a substantial risk of harm if continuing supervision were withdrawn. Nevertheless, the burden remains on the

---

[9] Section 364, subdivision (c) further provides that "[f]ailure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." While some dispute exists in this case about whether Parents *completely* complied with their case plan, there was no contention that either parent failed to regularly participate. Therefore, the Agency did not have the benefit of a prima facie showing that jurisdiction should be continued.

Agency to establish the need for continued supervision.[10]  Applying the appropriate burden and standard of proof to the entire record, we conclude the juvenile court's determination that the Agency failed to meet its burden of proof is supported by substantial evidence.

The dependency case began when Mother briefly left I.G. home alone near some hazardous conditions or materials when I.G. was 15 months old.  Substantial evidence that Mother had serious and ongoing mental health problems included an incident of psychosis at I.G.'s birth, multiple (though conflicting) diagnoses of mental illness, multiple observations of her flat affect and distraction, and Father's admission that she had mental health issues.  As of the date of the jurisdiction hearing, there was evidence that Mother was not yet receiving an effective regular treatment regimen and there were incidents as recent as April and June 2013 when Mother lashed out at Father due to her mental instability, and Father was unable to calm her down.  We previously upheld the court's jurisdiction finding because the aforementioned evidence clearly demonstrated at that time Mother's continuing mental instability and resulting propensity to lash out; her inability to care for I.G. alone; I.G.'s heightened risk of injury due to inattention because she was less than two years old; and Father's inability to reliably protect I.G. from the consequences of Mother's instability—facts which constituted substantial evidence that I.G. faced a substantial risk of serious physical harm.

At the February 2014 status review hearing, the Agency failed to demonstrate that Mother continued to have no effective treatment regimen for her mental health problems.  The Agency produced the August 2013 evaluation that diagnosed Mother with a bipolar disorder and concluded that she needed to accept this diagnosis and participate in bipolar-

---

[10] Parents would have the burden of proving that changed conditions justified termination of jurisdiction on a petition under section 388 to modify the court's prior order.  Although Mother filed a section 388 petition here and thus would have borne the burden of proof on that petition had the court considered it prior to the scheduled status review hearing, the court did not address the petition until the status review hearing itself.  Mother's petition was mooted by termination of jurisdiction.  At the review hearing, the section 364 burden of proof fell squarely on the Agency.

13

specific treatment in order to become stable.  However, that evaluation took place six months before the status review hearing, and was based on a single evaluation session. Mother produced a more recent evaluation by a board-certified psychiatrist who had been treating her regularly for nearly a year, had conducted an in-depth evaluation of her less than one month before the hearing, and explained his reasons for disagreement with a bipolar diagnosis.

Minor's counsel raises reasonable concerns about the reliability of the January 2014 evaluation:  the psychiatrist was chosen and paid by Mother; he provided Mother with medical management only and not talk therapy; and Mother's failure to consent to release of records might have suppressed information unfavorable to her. Counsel also notes that the January 2014 evaluation acknowledged Mother had "periodic continuing presentation of psychotic symptoms."  Minor's counsel argues that Mother's continued opposition to the original jurisdictional and dispositional orders demonstrated that she was still in denial about the nexus between her mental health and I.G.'s safety, and that Father's arguments in the court below showed that he lacked insight into the seriousness of Mother's psychotic condition and the risks it posed to I.G.

All of these arguments, however, were presented below and we cannot conclude that the record compelled the juvenile court to reject the January 2014 evaluation and accept the August 2013 evaluation.  Importantly, no expert witness testified that the psychiatrist's treatment of Mother was inappropriate or that his medical opinion lacked support.  Nor did the Agency prove that the treatment was ineffective.  It was undisputed that Mother regularly met with the psychiatrist and complied with his prescribed medication regimen.  No evidence was presented of gaps in treatment as there had been between I.G.'s birth and the start of the dependency case.  Both the psychiatrist and Father observed marked improvement in Mother's presentation, providing evidence that the treatment was effective at least in part.

The Agency also failed to demonstrate that Mother was so unstable that she would lash out in a way that Father could not manage:  no reports had been made of Mother's lashing out or suffering severe anxiety attacks since the jurisdiction hearing, and there

14

had been no further emergency calls by Father or police interventions. Service providers complained of Mother's inappropriate affect, laughing or smiling inappropriately during serious conversations, but the court reasonably could have found that these concerns did not implicate the safety risks that led to the initial assumption of jurisdiction.

Finally, although a closer call, the court could reasonably find that the Agency failed to demonstrate Mother could not care for I.G. alone. Father testified that Mother was proactive with I.G., feeding, cleaning, comforting and playing with her. The psychiatrist reported appropriate interactions between Mother and I.G. and an appropriate understanding by Mother of the parental role. It was undisputed that Mother was participating in individual and dyad therapy, with the only concern being the degree of her engagement. Significantly, there was also evidence that I.G. was happy, clean, healthy and developmentally on track.

Minor's counsel characterizes the juvenile court's finding as "optimistic speculation." We agree that the conflicting record evidence here could well have justified contrary findings and a continuing exercise of jurisdiction. We do not, however, "reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) In making its orders, we presume that the juvenile court is always cognizant of its "equitable duty to protect the welfare of the children within its jurisdiction." (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 557.) On this record, we cannot conclude that the evidence compelled the juvenile court to conclude that I.G. faced a substantial risk of harm unless dependency jurisdiction was continued.

### III.   DISPOSITION

The order terminating dependency jurisdiction is affirmed.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

SIMONS, J.