Filed 3/12/26  In re L.S. CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re L.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D087207 |
| Plaintiff and Respondent, | (Super. Ct. No. J520810) |
| v. | |
| MELISSA P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Melissa P. (Mother) appeals from the juvenile court's disposition order removing her child L.S. from her physical custody. (Welf. & Inst. Code,[1] § 361, subd. (c)(1).) She contends no substantial evidence supports the court's finding there was "no reasonable means" by which L.S.'s "physical health" could be protected short of removal. We conclude clear and convincing evidence supports the court's September 19, 2025 order.

BACKGROUND

I.

*Dependency History*

Between July 2021 and June 2022, Mother and S.S. (Father), who is not a party to the appeal, participated in court-ordered family maintenance services due to domestic violence. In one incident in June 2021, Mother asked Father to prepare a bottle for L.S., who was lying next to her. Father returned to their bedroom with a "metal object" and used it to " 'smash[ ]' " Mother in the face, causing her to suffer a black eye and a cut that required 12 stitches to close and left a scar.

Mother initially told the San Diego County Health and Human Services Agency (Agency) that she and L.S. would be moving out-of-county to live with the maternal grandmother. Mother, however, changed her mind to keep the family intact. As part of the family maintenance case, she completed all services including for domestic violence. On termination of the case in June 2022, Mother received physical custody of L.S.

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

That same month, the family court issued a criminal protective order (CPO) against Father. The CPO allowed for "peaceful contact" between the parents. The court, however, subsequently deleted that provision at Mother's request. The modified CPO, which expired in February 2026, required Father to stay 100 yards away from Mother and prevented any "personal, electronic, telephonic, or written contact."

In early February 2023, the family court granted Mother's request for a domestic violence restraining order (DVRO) against Father. In an August 6, 2024 minute order, the family court expressed "concern[ ]" the parents were violating the DVRO while also acknowledging the CPO. At Mother's request, the court at that hearing dissolved the DVRO and set a visitation schedule for Father.

## II.

### *The Petition*

Between May and July 2025, there were additional incidents of domestic violence between the parents. In May, Father pushed Mother out of his truck, after he told her, " 'I'm going to kill you.' " L.S. was in the backseat during this incident. On July 13, Father shoved Mother to the ground, causing her to suffer scratches on her back. A few days later, he called law enforcement to report a physical altercation with Mother. During this incident, she entered Father's home and locked herself inside. Father responded by breaking a window to gain entry. Law enforcement arrested Father for violating the CPO and for domestic violence, corporal injury to a spouse. (Pen. Code, §§ 273.6, subd. (a), 273.5, subd. (a), respectively.)

On July 19, 2025, law enforcement responded to a report that Father was at Mother's home. Mother refused to allow the officers inside, first claiming she was "nude" and later that she was "sick." Mother also told the

3

officers Father already had left and that the reported disturbance was her "yelling" at L.S. because "she was pregnant." Mother eventually admitted Father was inside and officers arrested him for violating the CPO.

During the Agency's investigation, Mother was "secretive about her location, delayed contact with the Agency, and was reluctant to give the Agency access to L.S. for an interview." Despite the prior dependency, the Agency opined Mother lacked insight and maturity when discussing the "protective issue" of domestic violence.

On August 11, 2025, the Agency filed a petition on L.S.'s behalf under section 300, subdivision (b)(1), due to the parents' "pattern of domestic violence including a prior dependency case . . . , which remain[ed] untreated and place[d L.S.] at substantial risk of serious physical harm." The Agency also sought a protective custody warrant to remove L.S. from Mother's care, which the juvenile court granted that same day.

III.

*Detention*

At the August 13, 2025 detention hearing, the juvenile court made a prima facie finding on the petition, removed L.S. from Mother's physical custody, and placed him with the paternal aunt. The court ordered (1) the parents not to be at or near the property of the paternal aunt and (2) the Agency to coordinate all visitation, including virtual visitation. During that hearing, L.S.'s counsel reported L.S. "was able to express the fighting he has witnessed between his mother and his father."

Less than a week after the hearing, the paternal aunt reported she no longer could care for L.S. due to "stress," as Mother was messaging her stating the aunt was a " 'monster' " for not allowing Mother to see L.S. The paternal aunt informed the Agency that the parents had been together

4

between August 16 and 18, 2025, and stated she wanted no further contact with them because they were "not following the CPO." At a special hearing on August 26, the juvenile court placed L.S. with the maternal grandmother.

IV.

*Jurisdiction / Disposition*

The Agency's jurisdiction/disposition and addendum reports expressed concern for L.S.'s physical safety due to (1) the parents' ongoing domestic violence; (2) Mother's attempts to minimize the potential harm to L.S., including repeatedly lying to law enforcement; and (3) unresolved questions about her "mental health." The Agency opined Mother had not learned the skills to be protective of L.S. and lacked insight regarding how her relationship with Father and their domestic violence impacted the child's well-being. As relevant here, the Agency recommended (1) a true finding on the petition; (2) that L.S. remain out of the home; and (3) that Mother (i) receive reunification services including for domestic violence through individualized therapy, (ii) continue with supervised visitation, and (iii) follow the terms of the CPO.

At the September 19, 2025 contested jurisdiction/disposition hearing, a social worker testified the Agency had recommended removal of L.S. from Mother's physical custody because of the parents' ongoing domestic violence and her refusal to cooperate with the Agency. During the trial, the social worker was asked about attendance sheets Mother had previously provided to the Agency purportedly showing L.S. was in daycare when some of the domestic violence incidents occurred in July 2025. The social worker, however, questioned the veracity of the attendance sheets, testifying they were missing dates and showed L.S. was signed in and out at exactly the same time each day (i.e., 9:00 a.m. and 5:00 p.m.).

5

The Agency requested that Mother participate in individual therapy to "tackle domestic violence" and her "mental health" behaviors. Mother, however, claimed she was doing individual counseling with her provider from the prior dependency, which was contrary to the Agency's recommendation. The Agency then had no knowledge of Mother engaging in domestic violence services.

Mother testified she was aware that the CPO remained in effect through 2025, admitted L.S. was present during the domestic violence incident in May 2025, but denied any domestic violence on July 13, 2025, when Father pushed her to the ground, or that L.S. was present during that incident. Mother admitted there was domestic violence on July 17, 2025, but also denied L.S. was present on that occasion. Mother acknowledged L.S. was at her home on July 19, 2025, when officers arrested Father for violating the CPO.

Mother stated she took domestic violence classes as part of her services in the prior dependency case. When asked about the May and July 2025 incidents and how she could prevent such violence in the future, Mother testified she had (1) "bought a new car that's very reliable," and thus would not need to call Father or his family for help, which she claimed had led to the May incident, and (2) learned to "always have an Uber account, to take the bus and learn the bus system, and always have a charger for [her] phone." Regarding the July 17, 2025 incident, Mother stated she no longer would "accept help from [Father's] parents"; and as to the July 19, 2025 incident, she would "not answer[ ] the door."

At the time of disposition, Mother had just moved into a domestic violence shelter where children could also safely reside. She had participated in individual therapy for about "two weeks," in therapy through her previous

6

provider for about "three or four weeks," and art therapy and parenting therapy through the shelter. Regarding the Agency's referral for domestic violence, Mother testified she had not begun classes because after assessment, the director indicated Mother did not need the program because she already had a "good understanding of the domestic violence cycle." Mother, however, stated she would be willing to do a domestic violence program if recommended by a resource therapy provider.

Mother testified that her last contact with Father was on July 19, 2025. She denied trying to resume a relationship with him, stating she was "pursu[ing] a relationship with someone else that has a career in children's psychology" and who was "amazing" with L.S. Mother, however, was most focused on starting a "new life."

The juvenile court admitted the Agency's detention and jurisdiction/disposition report, including the addendum. After hearing the argument of counsel, it made a true finding on the petition, declared L.S. a dependent child, and found by clear and convincing evidence that (1) there "is or would be substantial danger to the physical health, safety, protection, [or] physical or emotional well-being" of L.S. if he returned home; and (2) there was "no reasonable means" by which L.S.'s "physical health [could] be protected without removal." In making these findings, the court noted that Mother appeared to "really lack[ ] insight on domestic violence," despite receiving services in the prior dependency; and that she had not demonstrated the ability to implement the skills she had learned to protect L.S.

7

DISCUSSION

I.

*Governing Principles*

A juvenile court has "broad discretion" to determine a child's best interest when crafting a disposition order. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) The court, however, may not remove a child from a parent's physical custody unless it "finds by clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home, and there are no reasonable means by which the [child's] physical health can be protected without removing the [child] from the [child's] parent's . . . physical custody." (§ 361, subd. (c)(1).)

For removal, or continued removal as in this case, there is no requirement that the parent be dangerous or that the child suffer harm. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) Instead, section 361, subdivision (c), focuses on "averting" harm to the child. (*In re John M.*, at p. 1126 [cleaned up].) In determining whether removal is necessary, the court may consider a "parent's past conduct as well as present circumstances." (*Ibid.* [cleaned up].)

We review a disposition order for substantial evidence, bearing "in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re M.V.* (2022) 78 Cal.App.5th 944, 960 [cleaned up].) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable the fact was true." (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012; accord, *In re K.M.* (2024) 102 Cal.App.5th 910, 914.) Under this standard, we "view the record in the

8

light most favorable to the prevailing party . . . and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, at pp. 1011–1012.) "[T]he appellant bears the burden of showing there is no evidence of a sufficiently substantial nature to support the dispositional removal order." (*In re L.O.* (2021) 67 Cal.App.5th 227, 245 [cleaned up].)

## II.

### *Analysis*

Mother does not challenge the juvenile court's finding there was a "substantial danger" to L.S.'s "physical or emotional well-being" if returned home. (See § 361, subd. (c)(1).) Instead, she contends there is no clear and convincing evidence to support its related finding that there was "no reasonable means" to protect his "physical health" short of removal (see *ibid.*), since she had secured housing in the domestic violence shelter where he also could live. We disagree.

Evidence in the record supports the juvenile court's finding that Mother lacked insight into the protective issue, which endangered L.S.'s "physical health" and made his continued removal necessary. (See § 361, subd. (c)(1).) Mother admitted taking domestic violence classes in the prior dependency, which ended in June 2022, and acknowledged at disposition that the CPO existed through 2025. She nonetheless continued to have contact with Father, despite domestic violence incidents in 2023 (when the family court granted the DVRO, which she later voluntarily dismissed), in 2024, and in 2025, including in May when Father, in L.S.'s presence, forcibly removed Mother from his truck and threatened to kill her.

9

Moreover, Mother's testimony at disposition regarding the parents' most recent domestic violence—including what she had learned and how she would apply that knowledge to prevent such future incidents—further demonstrated her lack of insight. Quite simply, domestic violence is not prevented by buying a "reliable car" and learning the "bus system," or "not answer[ing] the door" when law enforcement knock, as Mother testified.

In addition, Mother repeatedly lied to law enforcement about being in contact with Father when officers came to her door on July 19, 2025. There also was evidence that she and Father were together between August 16 and 18, 2025, just *days* after the detention hearing when the juvenile court placed L.S. with the paternal aunt. Mother also failed to follow the juvenile court's order following detention requiring the Agency to coordinate all parental visitation. Mother instead repeatedly messaged the paternal aunt and called her a " 'monster' " for not allowing Mother to see L.S. Mother's failure to follow court orders—including most notably the CPO—is additional support for the court's finding that Mother has yet to understand the risk of harm to L.S. caused by her continued relationship with Father. (See *In re John M., supra*, 212 Cal.App.4th at p. 1126 [the focus of the removal statute is to avert harm to the child].)

We are also not persuaded by Mother's contention that L.S.'s removal was unnecessary because she could care for him at the domestic violence shelter. At the time of disposition she had only lived at the shelter for a few weeks, had yet to start individual domestic violence therapy, as required under her case plan, and had only a few therapy sessions with the provider from her previous dependency. The record shows Mother was only in the early stages of addressing the protective issue that necessitated L.S.'s removal.

There is no doubt that Mother loves L.S. very much, as the juvenile court and the Agency also recognized. But the primary goal of the dependency statutes is " 'to ensure the safety, protection, and well-being' " of a child (*In re Paul W.* (2007) 151 Cal.App.4th 37, 44), with the child's best interest being of "paramount concern" (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 550). But on the whole record, we conclude (1) there is "high probability" that a reasonable fact finder would find there was "no reasonable means" by which L.S.'s "physical health" could be protected without removal (see § 361, subd. (c)(1); *Conservatorship of O.B., supra,* 9 Cal.5th at p. 1011; *In re K.M., supra,* 102 Cal.App.5th at p. 914); and (2) the juvenile court properly exercised its "broad discretion" when it ordered L.S. to remain in the care of the maternal grandmother, with Mother to receive services (see *In re Nada R., supra,* 89 Cal.App.4th at p. 1179).

## DISPOSITION

We affirm the juvenile court's September 19, 2025 disposition order.

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

11